## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Physician Specialty Pharmacy, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>Prime Therapeutics, LLC,<br><br>          Defendant. | Case No. 18-CV-01044 (PJS/BRT)<br><br><br>**AMENDED COMPLAINT<br>AND JURY DEMAND** |

## I.     INTRODUCTION

1.      Prime Therapeutics, LLC ("**Prime**") is wrongfully holding or failing to pay more than $700,000 that belongs to Physician Specialty Pharmacy, LLC ("**PSP**") for prescription drugs that PSP dispensed to Prime's beneficiaries.  In order to avoid paying this money to PSP, Prime has threatened PSP and attempted to damage PSP's business.

2.      Furthermore, Prime terminated PSP from its provider network and took other actions against PSP in violation of federal antitrust laws as part of an agreement, combination, and conspiracy to restrain trade and establish/maintain a monopoly.

3.      Prime is a pharmacy benefit manager ("**PBM**"), which manages prescription drug coverage for health insurers and processes prescription drug claims for pharmacies that dispense drugs to the insurers' beneficiaries.

4.      Prime acts as an agent for the insurers and as used herein the terms "Prime's members" or "Prime's beneficiaries" refer to the beneficiaries of the health insurers, HMOs, health plans, and/or other payors that have contracted with Prime.

5.      PSP is a pharmacy that has dispensed prescriptions to Prime's members as part of Prime's network of pharmacies.

6.      When PSP provided a prescription to a Prime member, Prime processed the prescription and was required to pay PSP based on price terms established in an electronic interface that Prime maintained.  The agreement between PSP and Prime for each prescription was established by the terms that this interface established.

7.      PSP incurred substantial costs for the drugs that it provided to Prime's members.  In fact, in many/most cases, the underlying cost of the medication that PSP received from its supplier/wholesaler constituted the majority of the price that Prime paid (or should have paid) to PSP.

8.      Despite the fact that PSP dispensed prescriptions to Prime's members and PSP incurred substantial costs to do so, Prime has withheld payment to PSP.

9.      Prime has attempted to justify its refusal to pay PSP by using an unlawful, unilaterally-imposed pharmacy audit and appeals procedure.  This procedure was internally controlled by Prime and was used as a subterfuge to refuse payment for prescriptions that PSP provided to Prime's beneficiaries.

10.     More specifically, Prime withheld payments to PSP while Prime conducted a series of 25 almost weekly audits.  Prime unlawfully delayed providing audit results for 4 – 7 months (depending on the audit) while encouraging PSP to continue dispensing medications to Prime's beneficiaries.  PSP relied on Prime's representation that the audit process would be fair and continued dispensing expensive medications to Prime's beneficiaries.  Finally, after months of allowing PSP to dispense medications without

payment, Prime rejected the majority of PSP's claims.  Prime refused to pay PSP for over

$700,000 worth of prescriptions that PSP had dispensed to Prime's beneficiaries.

11.     Prime further used its audit process as a pretext to terminate PSP from its

pharmacy network and damage PSP's business.

12.     PSP seeks damages, declaratory relief, and equitable remedies for these and

other harms that resulted from Prime's unlawful, bad-faith actions.

## II.     __PARTIES__

13.     Plaintiff, PSP, is organized pursuant to the laws of the State of Florida and

maintains its principal place of business at 6258 North W. Street, Pensacola, Florida

32505.  PSP is a licensed pharmacy in the State of Florida and in several other states.

PSP operates as a specialty pharmacy and serves local patients in the Pensacola, Florida

area, which is on the border of Alabama and Florida.  PSP also serves patients in multiple

other states as a mail-order pharmacy.

14.     Defendant, Prime, is organized pursuant to the laws of the State of

Delaware and maintains its principal place of business at 1305 Corporate Center Drive,

Eagan, Minnesota 55121.  Prime is a PBM that does business across the United States,

including in the States of Minnesota and Florida.  Prime is one of six PBMs that

collectively manage the pharmacy benefits for over 90% of all outpatient pharmacy

claims in the United States (collectively referred to as the "**Major PBMs**").

15.     Prime managed approximately 320 million prescription drug claims and

$23.44 billion in prescription drug spending in 2017.[1]

16.     Prime is owned by a group of 9 "owner clients," which are all health

insurers that are members of the Blue Cross Blue Shield Association.

17.     Prime is primary or exclusive PBM for many of PSP's patients.  For

example, Prime manages the prescription drug benefits for Blue Cross Blue Shield of

Alabama ("**BCBS of AL**"), which controls approximately 93% of the Alabama large

group health insurance market.[2]  Prime also manages the prescription drug benefit for the

Guidewell Mutual Holding Group ("**Florida Blue**"), which controls 49% of the Florida

large group health insurance market.[3]

18.     Prime is an essential customer for any pharmacy doing business near the

Florida-Alabama border (like PSP).

19.     Upon information and belief, Prime has entered into agreements with the

other Major PBMs in order to control both their customers (*e.g.*, patients) and their

suppliers (*e.g.*, pharmacies).

---

[1] https://www.primetherapeutics.com/en/news/Resources/companyinfo.html (last
accessed Apr. 17, 2018).
[2] https://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-
insurers-large-group-
market/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sor
t%22:%22asc%22%7D (last accessed Apr. 17, 2018).
[3] *Id.*

20.     Prime has also entered into an agreement to partner with Walgreens Boots Alliance, Inc. ("**Walgreens**") to further control the prescription drug market, including the specialty pharmacy and the mail-order pharmacy drug markets, in particular.

21.     Upon information and belief, Prime and Walgreens agreed that Prime would use its power as a PBM to take action against PSP and other similarly situated specialty and/or mail-order pharmacies.  This would effectively increase the market power of the Prime/Walgreens partnership.

## III.    JURISDICTION AND VENUE

22.     PSP brings this action against Prime under §§ 1-2 of the Sherman Act, 15 U.S.C. §§ 1-2, and also under the Clayton Act, 15 U.S.C. §§ 14-15. Consequently the Court possesses federal question jurisdiction under 28 U.S.C. § 1331 and antitrust jurisdiction under 28 U.S.C. § 1337(a).

23.     The Court further possesses supplemental jurisdiction over PSP's state-law claims under 28 U.S.C. § 1367.

24.     Alternatively, this Court has jurisdiction to hear this case under 28 U.S.C. § 1332(a) because the PSP and Prime are citizens of different states and the amount in controversy exceeds $75,000.  PSP is a citizen of Florida because all of its members are citizens of Florida.  Prime is organized pursuant to the laws of Delaware and is headquartered in Minnesota.  Upon information and belief, Prime is not a citizen of Florida.

25.     This Court has personal jurisdiction over the parties and venue is proper because PSP consents to personal jurisdiction for purposes of this action only while

Prime's principal place of business is located in Minnesota and Prime is subject to courts of general jurisdiction in Minnesota.  Venue is further proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), based on the facts that a substantial portion of the events giving rise to PSP's claims occurred in this District, and that Prime is a resident of, and subject to personal jurisdiction in, the State of Minnesota for purposes of the federal venue statute.

## IV.   <u>FACTUAL ALLEGATIONS</u>

26.   PSP processed claims for Prime' beneficiaries for years without incident.

27.   Then, in late 2015 and early 2016, Prime began a series of 25 pretextual audits against PSP.

28.   Before the audits were even completed, Prime unlawfully refused to pay PSP for over $700,000 worth of claims that PSP submitted between December of 2015 and May of 2016.

29.   In fact, Prime unlawfully delayed audit results for 4 – 7 months while PSP continued to dispense medications to Prime beneficiaries.  Prime delayed these results so that it could continue receiving the benefit of PSP dispensing valuable medications. Prime never had any intention of conducting its audits in good faith, though.

30.   Prime manufactured bad-faith audit results to try to justify its unlawful refusal to pay PSP for the prescriptions that PSP properly dispensed to Prime's beneficiaries.  These bad-faith audit results included hundreds of thousands of rejected claims for alleged clerical, scrivener, or technical errors.

31.    Furthermore, Prime terminated PSP from its provider network for allegedly "poor audit performance" before Prime even concluded its audits and before PSP had a chance to appeal any of the audit results.

32.    For PSP to demonstrate that there was no "poor audit performance" and for PSP to obtain the monies that it was owed, Prime required PSP engage in an administrative audit appeals process.  This audit appeals process was conducted internally by Prime, and Prime intentionally dragged the appeals process out for over a year before issuing final determinations.

33.    In the meantime, PSP appealed its termination from Prime's network, but Prime refused to render a decision on the appeal of termination until Prime's audits of PSP were complete and PSP's appeals were final.

34.    It was not until April 20, 2017, that Prime made final audit/appeals determinations.  This was more than 16 months after the first audits were conducted and more than a year after the initial audit results were reported to PSP.

35.    It was not until May 8, 2017, that Prime made a final decision to reject PSP's appeal of termination from Prime's network.  This was almost a year after the initial notice of termination was sent by Prime to PSP.

36.    Prime conducted its audits and audit appeal process unlawfully and in bad faith.

37.    Prime's beneficiaries received prescription medications from PSP as requested by their doctors/prescribers but Prime never paid PSP.

38.    PSP paid hundreds of thousands of dollars for the drugs that it dispensed.

39.     Upon information and belief, Prime was paid by health insurers or other payors for the prescriptions that PSP dispensed/claimed, even for those claims where Prime withheld payment from or rejected payment to PSP.  Upon information and belief, Prime has retained part or all of this money.

40.     PSP reserves the right, however, to seek relief as against any other persons who are responsible for payment and/or who benefitted from the prescriptions that PSP dispensed.

41.     In this action, PSP seeks damages/payment in connection with all of the prescription claims that are identified in **Exhibit A** and are hereafter referred to as the "**At-Issue Claims**."  Payments for any claims that are not At-Issue Claims is beyond the scope of this Complaint.

42.     PSP also seeks any/all damages that are caused by Prime's conduct towards PSP, Prime's bad-faith conduct, Prime's unlawful conduct, Prime's conduct throughout the claims processing and payment process, Prime's conduct throughout the audit and appeals process, and/or Prime's termination of PSP from its provider network.  All of this conduct caused damages to PSP's business in excess of $700,000.

43.     Without limiting the foregoing, below is a more detailed description of the parties' dealings and PSP's causes of action.

A. **Relationship of the Parties**

44.     At all relevant times until May of 2016, PSP dispensed prescription drugs to Prime's members.

45.     The status and enforceability of the various alleged contracts that governed the relationship between PSP and Prime is a key question in this action.

46.     Regardless of any other contract terms that may have applied, though, the price, quantity, and other key terms for each prescription were agreed to between PSP and Prime when each claim was processed.

47.     Each claim was processed using an electronic interface.  Using the interface, PSP would submit claims for prescriptions that it would dispense to Prime's members.  Via the interface, Prime would tell PSP whether and how much Prime would pay for each prescription.  This interface would also establish whether a copayment was required from the member and the size of the copayment.  PSP would then dispense the prescription based upon the terms set forth in Prime's electronic interface.  These were the essential terms for each transaction and formed a contract as to each claim. An example screenshot of the electronic interface is attached as **Exhibit G** (redacted for PHI).

48.     Upon information and belief, once a claim for a prescription is processed through the electronic interface, Prime receives payment from health insurers and other payors, regardless of whether Prime later refuses to pay the pharmacy.

49.     In this way, Prime can receive payment for a service that the pharmacy renders without arousing the suspicion of its customers (the beneficiaries and their insurers/payors) when Prime later rejects or recoups payment from the pharmacy.

50.     The key terms of the transactions between PSP and Prime are set forth in the above-mentioned electronic interface.

51.     Nonetheless, Prime has asserted that its relationship with PSP is also governed by:

     a.  State laws that regulate insurance and govern the relationships between PBM's and pharmacies; and

     b.  A "Pharmacy Participation Agreement between Prime and Trinet;" and

     c.  Prime's unilaterally-adopted and amended Provider Manual.

52.     PSP agrees with Prime that states' laws govern the relationship between PSP and Prime and supersede any contrary agreements between the parties.

53.     As will be described more fully herein, the terms of any alleged "Pharmacy Participation Agreement between Prime and Trinet" and Prime's Provider Manual cannot, however, be enforced against PSP because they are unlawful, unconscionable, adhesive, and void as against public policy.

54.     In a May 16, 2016 notice of termination letter (attached as **Exhibit B**), Prime first raised the alleged "Pharmacy Participation Agreement between Prime and Trinet." This is the alleged Agreement that would purportedly allow Prime to unilaterally adopt and amended a Provider Manual.

55.     Counsel for PSP requested a copy of the Pharmacy Participation Agreement from Prime in an appeal letter dated June 14, 2016 (attached as **Exhibit C**).  To the date of this filing, Prime has refused to provide a copy of this Agreement to PSP.

56.     PSP can only surmise that Prime is referring to the 2007 Prime Therapeutics LLC Pharmacy Participation Agreement (PSAO) that PSP has attached hereto as **Exhibit D** (hereafter referred to as the "**2007 Trinet Agreement**").

57.     The 2007 Trinet Agreement along with Prime's unilateral Provider Manual are or would be unconscionable and adhesive if either was ever effective at-all.

58.     Even if, *arguendo*, the 2007 Trinet Agreement and Provider Manual were found to govern some aspects of the relationship between Prime and PSP, Prime still breached the 2007 Trinet Agreement and Provider Manual by, *inter alia*, conducting pretextual audits, unlawfully withholding payment from PSP, and wrongfully terminating PSP from its provider network.

### B.   Florida and Minnesota Law both Regulate Insurance; the Laws of both States Apply in the Absence of an Actual Conflict

59.     As noted above, both PSP and Prime agree that state law governs key aspects of the relationship between them.

60.     In fact, the laws of both Minnesota and Florida apply to this relationship to the extent that there is no actual conflict.

61.     The State of Florida has enacted laws in order to regulate insurance and pharmacy benefit managers within its borders.

62.     As noted above, PSP is a Florida pharmacy, located in Pensacola, FL.

63.     PSP dispenses the bulk of its prescriptions to patients living in this region.

64.     Prime submitted to Florida law by engaging in or with the business of insurance in the State of Florida.

65.     Minnesota has also enacted laws that regulate insurance and pharmacy benefit managers.

66.     Prime is a PBM that conducts its insurance-related activities from its headquarters in Minnesota.

67.     Accordingly, Prime is subject to the laws of the State of Minnesota.

68.     Where there is no conflict between the laws of Florida and Minnesota, Prime is subject to both states' laws with regard to its dealings with PSP.

### C. Prime's Pretextual Audits and Wrongful Termination of PSP

69.     Prime has asserted a unilaterally-adopted right to audit PSP's claims and unlawfully withheld all payment from PSP while audits were still pending and before appeals were complete.

70.     Prime further used blanket audits as a pretext to terminate PSP from its network.

71.     Prime unlawfully dragged its audit and appeal process on for more than a year while assuring PSP that Prime would conduct that process in good faith.

72.     Ultimately, Prime rejected more than $700,000 of PSP's claims for prescriptions that PSP actually dispensed to Prime's beneficiaries.  To compound the injury, PSP actually paid hundreds of thousands of dollars for the supply of medication that it dispensed.

73.     Prime then finalized its decision to terminate PSP from its provider network.

74.     Upon information and belief, Prime retained part or all of the money that it withheld from PSP.

75.     Prime's actions were unlawful and taken in bad faith.

76.     Beginning on December 14, 2015, Prime conducted 25 audits of PSP's

claims, covering all claims that PSP submitted from November 30, 2014 through May 27,

2016.

77.     These 25 audits were conducted in three batches.  As used herein, the

batches of audits were as follows:

a.      "**Batch 1**" was a single audit that Prime commenced on December 14,

2015.  Prime reviewed claims that PSP submitted between November

30, 2014 and November 30, 2015.  Prime gave this audit its internal

reference number 25953.  Prime failed to provide initial audit findings

to PSP for Batch 1 until April 19, 2016 (4 months later) and unlawfully

refused to provide final audit results until April 20, 2017 (more than a

year after the initial audit results).

b.      "**Batch 2**" was a set of three audits that Prime commenced on January 8

and 13, 2016.  Prime reviewed all claims that PSP submitted from

December 12, 2015, through January 8, 2016.  Prime gave these audits

internal reference numbers 26584, 26762, and 26567.  Prime failed to

provide initial audit findings to PSP until April 20, 2016 (more than 3

months after the audits were conducted) and unlawfully refused to

provide final audit results until April 20, 2017 (an entire year after the

initial audit results).

c.      "**Batch 3**" was a set of 20 additional audits that Prime commenced

almost <u>weekly</u> throughout the first half of 2016 and covered all claims

that PSP submitted from January 8, 2016 through May 27, 2016.  Prime gave these audits internal reference numbers 26906, 26758, 26904, 26905, 27307, 27052, 27243, 27031, 27266, 28692, 27433, 27471, 26163, 27797, 27812, 27840, 28102, 28310, 28391, 28441, 25953, 26567, 26584, and 26762.  Prime refused to provide initial audit findings for these audits until August 4, 2016 (more than 7 months late for some audits) and unlawfully refused to provide final audit results until April 20, 2017 (more than 8 months after initial audit results).

78.     While Prime was conducting these audits, but before any results had been issued, Prime began withholding all payments to PSP for the prescription drugs that PSP dispensed to Prime's members.  Prime did not make any payments to PSP for prescriptions that PSP dispensed after December of 2015.  This failure to make timely payment was unlawful.  *See, e.g.*, Fla. Stat. § 627.6131.

79.     Prime did not, however, reject any of PSP's claims during this time. Instead, in dozens of audit letters to PSP, Prime claimed to be withholding judgment on whether PSP claims would be accepted until the audit process was complete.

80.     Prime continued to encourage PSP to dispense prescriptions to Prime's beneficiaries with the understanding that PSP would eventually be paid for its services, once the audit process was complete.

81.     Prime delayed issuing audit results for the Batch 1 and Batch 2 audits until April 19, 2016 (over 4-months after the audit), and April 20, 2016 (over 3-months after the audits), respectively.

82.     This delay violated state law.  Furthermore, Prime used this delay to lull PSP into believing that it would be paid for the prescriptions that it was continuing to dispense.

83.     The initial audit results for the Batch 1 and 2 audits were also unjustified. Prime rejected over $300,000 worth of PSP's proper claims.  In an attempt to support these denials, Prime relied on alleged clerical errors and other minor technicalities.

84.     For example, and not by way of limitation, Prime rejected PSP's claims for allegedly entering an incorrect origin code, which indicated whether the prescriptions were received via telephone or facsimile.  PSP had entered the correct origin codes, but, nonetheless, this was an unlawful denial for an alleged clerical error.

85.     Prime also rejected claims on the basis that Prime had excluded certain drug wholesalers/suppliers that PSP used for its drug supply, but Prime never gave PSP advance notice of any such exclusions.  To be clear, Prime never had any approval right over PSP's wholesalers so long as those wholesalers provided their drug supply legally to PSP.  Even if, *arguendo*, there was such a right, Prime could not retroactively deny PSP's claims when Prime never notified PSP that it had excluded wholesalers/suppliers.

86.     Prime's bad faith was highlighted by the fact that it cast a particular wholesaler in a false light, claiming "[the wholesaler] is not an accepted wholesaler due to the intensive nature of the owner being linked to ongoing indictments."  This begs several questions.  What indictments?  Who is indicted?  Has anyone been convicted? Does this have anything to do with whether the wholesaler actually supplied medications

to PSP?  Why did Prime not notify PSP that wholesaler was excluded before PSP

purchased medications from the wholesaler?

87.     Prime informed PSP that if PSP wanted to receive payment for the rejected

Batch 1 and 2 claims, that it was required to submit to an administrative audit appeal

process.  The audit appeals would be reviewed by Prime's internal staff.  Nonetheless,

Prime claimed that PSP would have an opportunity to provide additional documentation

and present arguments as to why its claims should be paid.

88.     Before PSP had an opportunity to submit its appeals, however, Prime

summarily terminated PSP from its pharmacy network.

89.     Prime's termination letter, dated May 16, 2016, stated that PSP was being

terminated for "poor audit performance."  *See* **Exhibit B**.

90.     This was before PSP was given the opportunity to appeal the preliminary

Batch 1 and 2 audit results and before Prime had even issued preliminary Batch 3 audit

results.

91.     Prime's choice to terminate PSP for "poor audit performance" before any of

the audit results were finalized was pretextual and made in bad-faith and in violation of

law and equity.

92.     At the time, however, Prime made it clear to PSP that it could appeal the

termination and demonstrate that it did not have "poor audit performance" by supporting

its prescription claims through Prime's audit appeals process.

93.     In compliance with Prime's demands, PSP submitted audit appeals for the

Batch 1 and 2 audits on May 19, 2016 and May 20, 2016 respectively.

94.     PSP then submitted an appeal of its termination from Prime's network on June 14, 2016 (**Exhibit C**).

95.     It was not until August 4, 2016, that Prime finally issued preliminary audit results for the Batch 3 audits (almost 8-months after the first Batch 3 audits).

96.     Prime was already withholding all of the payments for PSP's claims related to the Batch 3 audits, but until August 4, 2016, Prime did not state whether any of those claims were being rejected.

97.     The failure to either pay or deny these claims was a violation of law, which created an uncontestable obligation for Prime to pay the majority of the Batch 3 claims. *See* Fla. Stat. § 627.6131.

98.     In the preliminary audit results for Batch 3, Prime rejected approximately 80% of PSP's claims, amounting to more than $500,000.

99.     Just as before, the rejections were based on alleged technical, clerical, or other errors, which had zero impact on the fundamental fact that patients actually received the prescriptions that PSP claimed.

100.    Prime issued initial determinations as to PSP's appeals of the Batch 1 and 2 audits results on August 4, 2016, and August 17, 2016, respectively.  Prime's appeal determinations for these audits were late again, in violation of state law.  Minnesota sets a 60-day statutory deadline for providing audit appeal results.  Minn. Stat. § 151.67(a). Batch 1 initial appeal results were issued after 77 days and Batch 2 initial appeal results were issued after 89 days, both in violation of law.

101.    Prime also refused to consider the documentation, explanations, and arguments that PSP provided in its Batch 1 and 2 audit appeals in good faith.

102.    As required by state law, however, Prime gave PSP an opportunity to a final appeal before its Batch 1 and 2 audit results were finalized.  Again, this final appeal was conducted by internal Prime staff.

103.    Before the final appeals were complete, Prime should have been prohibited from recouping any money from PSP under applicable state law.  Furthermore, upon the completion of the final appeals, Prime was required to remit to PSP any underpayments (*i.e.*, the amounts that Prime withheld for claims that Prime should have paid if Prime were acting in good faith) within 45 days.

104.    PSP submitted a final appeal of the Batch 1 claims on September 3, 2016.

105.    PSP submitted its initial appeal of the Batch 3 claims on September 3, 2016, providing substantial documentation and explanations to support its claims.

106.    PSP submitted a final appeal of the Batch 2 claims on September 16, 2016.

107.    It was not until November 23, 2016 that Prime issued initial audit appeal results for the Batch 3 claims.  Again, this was weeks after the 60-day statutory deadline for deciding audit appeals.  Following the initial appeal, Prime granted PSP's appeals as to only $33,663.65 out of more than $500,000 worth of Batch 3 claims.  Prime had no good-faith basis for denying the majority of PSP's claims in the initial audit results and had no good-faith basis to refuse to overturn the audit results on appeal.

108.    On the same day, however, November 23, 2016, counsel for Prime issued a letter that invited PSP to submit amended final appeals for the Batch 1 and 2 audits.

109.    The fact that Prime requested additional information for the Batch 1 and 2 appeals led PSP to believe that its documentation and arguments were being seriously considered by Prime.

110.    PSP submitted its final appeal of the Batch 3 audit on December 23, 2016.

111.    That same day, PSP also submitted a supplement to its Batch 1 and 2 final appeals.

112.    PSP then submitted supplemental information for the Batch 3 appeal on January 11, 2017.

113.    Prime inexplicably did not respond to the final appeals for 118 days.  This was almost double the 60-day statutory deadline.

114.    On February 28, 2017, PSP issued a letter demanding a final decision on its appeal of its termination from Prime's network and on its audit appeals.  PSP had appealed its termination from Prime's network more than 9-months earlier on June 14, 2016.  Prime had unreasonably delayed making a determination as to PSP's appeals.

115.    PSP also explained that the outstanding audit appeals had not been decided within the 60-day statutory deadline.  Prime had previously asserted that its decision on PSP's appeal of termination from the network could not be made until the full administrative audit appeal process was first completed.

116.    Prime still refused to respond for two more months.

117.    Finally, on April 20, 2017, Prime issued final audit results.  It had taken more than year to complete the audit and appeal process that Prime demanded PSP

participate in.  Prime claimed that this audit and appeal process was a condition for PSP to receive payment for the medications that it gave to Prime's beneficiaries.

118.    In the final audit results, Prime refused payment for over $700,000 worth of PSP's claims.

119.    These were prescriptions that PSP dispensed to Prime's beneficiaries.

120.    PSP incurred substantial costs for the drugs that it dispensed.

121.    Upon information and belief, Prime retained all or part of the $700,000.

122.    Prime's correspondence on April 20, 2017, also reiterated its position that "Prime would wait to consider PSP's appeal from its termination until the audit appeal process concludes."

123.    The April 20, 2017 correspondence went on to state that "As the audit appeal process has now concluded, PSP's appeal from its termination from Prime's network is currently under consideration."

124.    Finally, on May 8, 2017, Prime rejected PSP's appeal of its termination from Prime's network.

125.    Prime had represented to PSP that it would consider PSP's positions and documentation in good-faith.

126.    In reality, though, Prime never had any intention of considering PSP's appeals in good faith.

127.    Through its appeals process, Prime should have determined that the initial audit results were incorrect.  Prime should have determined that PSP should be paid for the prescriptions that it actually dispensed to Prime's beneficiaries.

128.    Prime failed to consider PSP's audit appeals in good-faith and unjustifiably rejected those appeals on April 20, 2017.

129.    Under Minnesota Law, Prime was required to pay PSP for all of the At-Issue Claims within 45 days after the final audit appeals results were issued on April 20, 2017.  Prime failed to make payment as required.

130.    On January 24, 2018, PSP submitted a notice of dispute to Prime, requesting a conference to discuss resolution of this dispute.

131.    During the dispute resolution conference, on March 15, 2018, counsel for Prime admitted that she was not aware of any PSP claims in which the patient did not receive the medication that was billed or the medication that was prescribed.

132.    Nonetheless, Prime has still not offered to make PSP whole by paying it for the At-Issue Claims.

133.    On April 17, 2018, PSP provided notice to Prime that it was terminating pre-litigation dispute resolution and proceeding to litigation.

### D.  Prime's Antitrust Violations

134.    Prime's actions against PSP were not just part of a mere business dispute.

135.    Prime intentionally took action against PSP as part of a conspiracy and agreement to monopolize markets and otherwise restrain trade.

136.    Prime's actions against PSP violated both §1 and §2 of the Sherman Act, as well as the Clayton Act.

#### i.    Relevant Markets

137.    The "**Relevant Markets**" are as follows:

a.  The Alabama specialty and mail-order pharmacy market; and

b.  The Alabama retail pharmacy market.

138.   The markets for the pharmacy business across the United States are defined by state borders because each state controls access to its market by licensing pharmacies and otherwise regulating pharmacies.  Many states, including Alabama, license out-of-state pharmacies to provide mail-order prescriptions to patients within their borders.

139.   The market for the specialty and mail-order pharmacy business is distinct from other retail pharmacy business markets, such as store-front pharmacies.

140.   For example, and not by way of limitation, specialty and mail-order pharmacies provide services such as compounding and provide specialty drugs that are not generally available at store-front pharmacies.  There are not generally substitute goods available except from other specialty and mail-order pharmacies.

141.   Furthermore, and not by way of limitation, mail-order pharmacy services are distinct because prescriptions are delivered direct to consumers.  Mail-order delivery is an additional service that is not provided by typical store-front pharmacies.  Mail-order delivery also requires additional effort and capital outlay on the part of the pharmacy, which is not required of store-front-only pharmacies.

142.   In fact, Prime recognized and admitted that the specialty and mail-order pharmacy business is a distinct market from store-front retail pharmacies when it announced its formation of a joint-venture with Walgreens to operate a specialty and mail-order pharmacy called AllianceRx Walgreens Prime.  *See* **Exhibit E**.

**ii.  Prime's Pre-Existing Monopsony Power in Alabama**

143.    As noted above, one of Prime's owner-customers is BCBS of AL.

144.    As noted above, BCBS of AL controls 93% of the large group health benefit in the State of Alabama.[4]

145.    Prime is the exclusive PBM for BCBS of AL's outpatient pharmacy benefit.

146.    As a result, Prime administers the benefits for over 90% of the pharmacy benefit market in Alabama.

147.    Prime administers over 90% of the specialty and mail-order pharmacy benefits in Alabama.

148.    Prime, by itself, and in collusion with its owner, BCBS of AL, holds monopsony power in those relevant markets.  This includes the power to allow pharmacies to dispense medications to the customer base that it controls.

### iii. The Relevance of the Markets to PSP

149.    As previously noted, PSP is located in Pensacola, FL, on the border of Alabama.

150.    A substantial number of PSP's customers are Alabama residents.  PSP provides prescriptions to these patients through interstate commerce.

---

[4] https://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-market/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last accessed April 18, 2018).

151.   To illustrate this point, the largest number of At-Issue Claims that PSP dispensed to Prime's beneficiaries were to Alabama residents.  This was more 200 prescriptions and greater than 1/3 of the At-Issue Claims.  By comparison, about 100 of the At-Issue Claims were for Florida residents.

152.   Prime was keenly aware of the fact that PSP had a substantial presence (for an independent pharmacy) in the Alabama specialty and mail-order pharmacy market and the Alabama retail pharmacy market.

### iv. Prime's Anticompetitive Agreement/Combination/Conspiracy with Walgreens and against PSP

153.   Prime has entered into an agreement with Walgreens to monopolize the Relevant Markets and to attempt to monopolize the Relevant Markets.

154.   As part of its agreement with Walgreens, Prime pretextually terminated PSP from its provider network because PSP is a competing retail pharmacy and competing specialty and mail-order pharmacy that conducts substantial business in Alabama.

155.   Both Prime and Walgreens wield vast market power, both in Alabama and nationally.

156.   Walgreens owns and operates the second largest chain of pharmacies in the United States.

157.   As explained above, Prime is one of the six Major PBMs that control over 90% of United States outpatient pharmacy benefits.

158. Prime controls more than 90% of the outpatient pharmacy benefits in Alabama.

159. In order to monopolize the specialty and mail-order pharmacy market in Alabama, Prime and Walgreens have created a joint-venture, AllianceRx Walgreens Prime ("**AllianceRx**").

160. AllianceRX is a "combined central specialty pharmacy and mail services company[.]" *See* Joint Press Release of Prime and Walgreens dated April 3, 2017, attached as **Exhibit E**.

161. The specific intent of forming AllianceRx is to monopolize specialty and mail-order pharmacy markets.

162. Prime already wields monopsony power over the Alabama retail pharmacy market and the Alabama specialty and mail-order pharmacy market.

163. Prime and Walgreens have therefore agreed that Prime will terminate competing pharmacies from its network, particularly independent pharmacies and pharmacies that compete in the specialty and mail-order space.

164. As part of this plan, Prime and Walgreens agreed that Prime would take action against PSP to remove it from Prime's network and to damage Prime's business.

165. Notably, the timing of Prime's actions against PSP coincide with its negotiations, agreements, and ultimate combination with Walgreens.

166. Prime first conducted the audits of the At-Issue claims in December of 2015. Shortly thereafter, Prime began withholding payment from PSP without issuing audit results or reasons for denial. Such action was in violation of the state law.

167.    At that same time, Prime was already planning to monopolize the Relevant Markets.

168.    Upon information and belief, Prime had also already agreed with Walgreens to take active steps to restrain competition in those markets.

169.    As noted above, Prime failed to provide initial audit results to PSP for months.

170.    Notably, Prime issued pretextual audit results for the Batch 3 audits on August 4, 2016 (8 months after the audits).  Prime also refused to consider PSP's initial audit appeals of the Batch 1 and 2 audits in good faith.  Prime issued blanket-rejections in its initial audit results for Batch 1 and 2 audits in August of 2016, as well.

171.    That same month, Prime and Walgreens announced their "long-term strategic alliance that includes . . . the combination of the companies' central specialty pharmacy and mail service businesses."  *See* Joint Press Release of Prime and Walgreens dated August 29, 2016, attached as **Exhibit F**.

172.    This "combination" was specifically established to monopolize the Relevant Markets and restrain other competing pharmacies.

173.    Furthermore, Prime and Walgreens had entered into agreements to harm competitors long before the August, 2016 announcement.

174.    On April 3, 2017, Prime and Walgreens publicly announced the conclusion of their "combination," the formation of AllianceRx.  **Exhibit E**.

175.    Later that month, on April 20, 2017, Prime finally issued its final audit results to PSP and denied the At-Issue Claims that PSP had submitted.

176.    Prime then rejected PSP's appeal of its termination from Prime's network on May 8, 2017.

177.    Prime took action against PSP as part of its agreements during negotiations with Walgreens.

178.    Prime finalized its actions against PSP in short order after Prime's combination with Walgreens was announced.

179.    PSP became a key early target of the conspiracy between Prime and Walgreens because PSP performed substantial specialty and mail-order pharmacy business with Prime's beneficiaries in Alabama and PSP was also an independent pharmacy that had no power against companies like Prime and Walgreens.

180.    Prime and Walgreens should not be allowed to monopolize and/or attempt to monopolize the Relevant Markets.  Prime and Walgreens should not be allowed to damage PSP as part of their monopolization efforts.

## V.    CLAIMS FOR RELIEF

### Count I – Wrongful Recoupment Under Minnesota Pharmacy Audit Integrity Program

181.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

182.    The Minnesota Pharmacy Audit Integrity Program is established by statute, Minn. Stat. § 151.60, *et seq.*

183.     With regard to any pharmacy audit, Minnesota statute provides that, "Any recoupment will not be deducted against future remittances until after the appeals process

and both parties have received the results of the final audit." Minn. Stat. § 151.63, Subd. 2, ¶5.

184.    As noted above, Prime did not respond to PSP's final appeals and did not provide final audit results until April 20, 2017.

185.    At that time, however, Prime had already recouped and withheld hundreds of thousands of dollars from PSP for the At-Issue Claims.

186.    As the direct and proximate result of Prime's violations of this statute, PSP has suffered damages including, but not limited to:

> d.  Cash-flow interruption and resulting business injuries;
>
> e.  Legal expense;
>
> f.  Loss of staff resources; and
>
> g.  Loss of income, interest, and the time-value of money.

187.    Minn. Stat. § 151.63, Subd. 2, ¶5 is specifically intended to protect PSP and provides PSP a right to seek damages that were caused by Prime's repeated violations of it.

188.    Wherefore, PSP is entitled to a judgment against Prime for damages together with interest, costs, and attorney fees.

## **Count II – Unlawful Refusal to Remit Underpayments Under Minnesota Law**

189.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

190.    Minn. Stat. § 151.67(d) requires each PBM to:

> [R]emit any money due to a pharmacy or pharmacist as a result of an underpayment of a claim within 45 days after the appeals process has been exhausted and the final audit report has been issued.

191.    The appeals process for Prime's 25 audits of PSP's claims was not exhausted and final reports were not issued until April 20, 2017.

192.    There were underpayments for the At-Issue Claims amounting to hundreds of thousands of dollars because Prime had withheld the money for the At-Issue Claims prospectively.

193.    Prime had an independent statutory duty to make payment for these underpayments by July 4, 2017 (45 days after the April 20, 2017, final results).

194.    Prime unlawfully and in bad faith refused to recognize these underpayments, however, and refused to comply with this duty by making payment by July 4, 2017.

195.    PSP has suffered damages as a direct and proximate result of Prime's refusal to remit overpayments by the statutory deadline.

196.    Minn. Stat. § 151.67(d) is specifically intended to protect PSP and provides PSP a right to seek damages that were caused by Prime's violations of it.

197.    Wherefore, PSP is entitled to a judgment against Prime for damages together with interest, costs, and attorney fees.

### Count III - Uncontestable Obligation to Pay Under Florida Law

198.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

199.    Prime has an **uncontestable** obligation to pay PSP for the majority of the At-Issue Claims under Florida law.

200.    Specifically, when a pharmacy submits a claim electronically, Fla. Stat. § 627.6131(4)(e) provides:

> [The] claim must be paid or denied within 90 days after receipt of the claim. Failure to pay or deny a claim within 120 days after receipt of the claim creates an uncontestable obligation to pay the claim.

201.    PSP submitted all of its claims to Prime electronically but Prime failed to deny or pay a large portion of those claims within 120 days.

202.    As previously noted, Prime conducted a blanket audit and withheld all payments for all of PSP's claims from December of 2015 through May of 2016.

203.    In its audit notification letters for the Batch 3 audits, Prime specifically stated, "You will receive a report once our review is complete with our payment determination."

204.    Prime, therefore, was not making a payment determination as to the Batch 3 claims at the time the audits were conducted and payment was withheld.

205.    Prime refused to notify PSP of its payment determinations for the Batch 3 claims until it issued initial audit results on August 5, 2016.

206.    Prime denied the majority of the Batch 3 claims, amounting to $513,766.20.

207.   Under Florida law, however, Prime has an uncontestable obligation to pay all the Batch 3 claims that PSP submitted on or before April 7, 2016.  All such claims were submitted electronically more than 120 days before Prime denied them.

208.   The majority of the Batch 3 claims were submitted by PSP on or before April 7, 2016 and Prime is required to pay PSP for all such claims.

209.   Furthermore, Prime is required to pay PSP for all other At-Issue Claims for which it neither made payment nor denied the claims within 120 days.  The Batch 3 claims have been identified as a illustrative example and not by way of limitation.

210.   Fla. Stat. § 627.6131(4)(e) provides PSP a right to seek a judgment for such claims.

211.   Wherefore, PSP is entitled to a judgment requiring Prime to pay for all At-Issue claims together with interest, costs, and attorney fees.

## Count IV – Violations of Florida Prompt-Pay Law

212.   Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

213.   Under Florida's prompt-pay law, PBM's are required to either pay each electronic claim or notify the pharmacy that the claim is denied or contested within 30 days after it is submitted.  Fla. Stat. § 627.6131(16).

214.   Prime violated this statute over a dozen times with regard to the At-Issue Claims.

215.   As the direct and proximate result of Prime's violations of this statute, PSP has suffered damages including, but not limited to:

    h.  Cash-flow interruption and resulting business injuries;

    i.  Legal expense;

    j.  Loss of staff resources; and

    k.  Loss of income, interest, and the time-value of money.

216.    Prime's violations of this statute are continuing and/or repeated in nature.

217.    Fla. Stat. § 627.6131(16) is specifically intended to protect PSP and provides PSP a right to seek damages that were caused by Prime's repeated violations of it.

218.    Wherefore, PSP is entitled to a judgment against Prime for damages together with interest, costs, and attorney fees.

## Count V - Unlawful Technical Denials and Denials without Harm to Patients/Plans

219.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

220.    As noted above, Prime rejected hundreds of thousands of dollars' worth of PSP's claims for alleged clerical, scrivener's, computer, and/or other technical errors.

221.    In each case, the patients received the benefit of PSP dispensing prescriptions and any alleged error had no negative impact, financial or otherwise.

222.    For example, and not by way of limitation, Prime rejected At-Issue Claims because PSP allegedly entered an incorrect "origin code" for faxed vs. telephone prescriptions.

223.    Even if, *arguendo*, this error actually occurred, it was a clerical error at most and does not impact the underlying fact that Prime's patients received prescriptions that PSP dispensed.

224.    While that is one example, the majority of the At-Issue Claims were ultimately rejected for similar technicalities.

225.    Both Minnesota and Florida have made it unlawful for a PBM to refuse payment to a pharmacy either based on a clerical (or similar) error or when a technical error causes no harm to the patients/plans.

226.    Under Fla. Stat. § 465.1885(1)(f), a pharmacy has a right to reimbursement for claims that are denied based on clerical, typographical, scrivener's, or computer errors.

227.    Similarly, Minnesota law holds that such errors cannot be used by PBM's as the basis of fraud allegations.  Minn. Stat. § 151.64(6).

228.    Furthermore, pursuant to Minn. Stat. § 151.64(7), "In the case of errors that have no actual financial harm to the patient or plan, the PBM must not assess any chargebacks."

229.    Prime has violated these laws by recouping, charging-back, and refusing to pay PSP's claims based on alleged clerical and similar errors.

230.    Prime has also violated these laws by refusing to pay PSP for claims based on alleged errors that cause no financial harm.

231.    As the direct and proximate result of Prime's violations of these laws, PSP has suffered damages that are well in excess of the $75,000 jurisdictional requirement.

232.    PSP is in the class of persons for whose benefit these laws were enacted.

233.    All of these statutes were enacted to create rights for and protect PSP and each of these statutes gives PSP the right to seek damages in this action.

234.    Wherefore, PSP is entitled to a judgment against Prime for damages together with interest, costs, and attorney fees.

### Count VI – Declaratory Judgment – Unconscionable or Adhesion Contract

235.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

236.    As noted above, Prime appears to that the 2007 Trinet Agreement (**Exhibit D**), governs the relationship between PSP and Prime.

237.    PSP prays for a declaratory ruling that the 2007 Trinet Agreement and any other similar agreements are unenforceable against PSP.  PSP further prays for a declaratory ruling that Prime's unilaterally adopted and amended Provider Manual is unenforceable against PSP.

238.    The 2007 Trinet Agreement is an adhesion contract and is otherwise unconscionable.

239.    The 2007 Trinet Agreement is substantively unconscionable.

240.    For example, and not by way of limitation, the 2007 Trinet Agreement allows Prime to unilaterally modify the conditions of payment and the conditions of performance.  Prime has applied this power to adopt pharmacy audit requirements, through its Provider Manual, that is uses to deny payment for claims for prescriptions that were actually dispensed to patients.

241.    Under the 2007 Trinet Agreement and Provider Manual, Prime is purportedly free to adopt conditions that allow it, in its sole discretion, to reject payment such that Prime retains the benefit of the pharmacy's efforts.

242.    Furthermore, the 2007 Trinet Agreement does not require Prime to affirmatively notify pharmacies when the Provider Manual is modified.  Pharmacies must either (a) read the entire provider manual prior to filling/dispensing each prescription or (b) accept the risk that Prime will reject their claims because of a unilateral amendment.

243.    With respect to PSP, specifically, Prime used its unilaterally adopted audit and appeal process as a subterfuge to refuse payment to PSP for prescriptions that PSP actually dispensed.

244.    The 2007 Trinet Agreement is also procedurally unconscionable and adhesive.

245.    The 2007 Trinet Agreement was unilaterally drafted by Prime and is forced onto pharmacies on a take-it-or-leave-it basis.

246.    As noted above, Prime is one of six Major PBMs that control over 90% of the U.S. pharmacy benefit market.  All six Major PBMs force unilateral terms onto pharmacies through their provider manuals.  All six Major PBMs have adopted similar audit procedures.  There is no option for pharmacies but to accept these unilateral terms of these PBMs.

247.    Upon information and belief, the six Major PBMs have entered into an agreement to force pharmacies, including PSP, to accept the PBMs' right to unilaterally amend contract terms, including audit procedures and that terms and conditions of

payment.  As a result, pharmacies cannot operate without being subjected to the PBMs'

arbitrary, unilateral audit/appeal processes.

248.    The 2007 Trinet Agreement is further procedurally unconscionable because

PSP never even executed the agreement itself.  It was executed by Trinet, not PSP.

249.    The 2007 Trinet Agreement does not require either Trinet or Prime to

provide a copy to PSP.  Nor do the terms of the 2007 Trinet Agreement require Trinet or

Prime to provide a copy of any amendments to PSP.

250.    In fact, as noted above, on June 14, 2016, counsel for PSP asked Prime for

a copy of the most current agreement between Prime and Trinet in connection with PSP's

appeal of its termination from Prime's network.  *See* **Exhibit C**, pg. 1.

251.    As noted above, Prime refused to provide PSP a copy of such agreement,

even after PSP's attorneys requested one.

252.    PSP cannot, therefore, truly know what the terms are or if Prime has, per

the 2007 Trinet Agreement, unilaterally amended the terms.

253.    The 2007 Trinet Agreement, Prime's unilaterally adopted/amended

Provider Manual, and any other similar purported agreements are adhesive, procedurally

unconscionable, substantively unconscionable.

254.    Wherefore, this Court should enter a judgment declaring the 2007 Trinet

Agreement, Prime's Provider Manual, and all other similar agreements/manuals

unenforceable against PSP.

## Count VII - Quantum Meruit

255.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

256.    PSP has conferred benefits onto Prime.

257.    Such benefits include, but are not limited to, providing the prescriptions to Prime's beneficiaries that are included in the At-Issue Claims, allowing Prime to receive payment for such prescriptions, providing mail-order services to make Prime's network more attractive, and providing specialty pharmacy services to make Prime's network more attractive.

258.    Prime has retained the benefits that PSP conferred.

259.    For example, and without limitation, upon information and belief, Prime received payment from patients, insurers, and others for the prescriptions that PSP dispensed in the At-Issue Claims but has not made payment to PSP.

260.    Under the circumstances of this case, it would be unjust and inequitable to allow Prime to retain the benefits that it has received.

261.    Wherefore, PSP is entitled to a judgment for the value of the At-Issue Claims together with interest, costs, and attorney fees.

## Count VIII – Unjust Enrichment

262.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

263.    As described above, with regard to the At-Issue Claims, PSP dispensed prescription medications to patients, who were Prime's beneficiaries.

264.    Prime refused to pay PSP for dispensing those medications.

265.    Prime unjustly refused to pay PSP for approximately 80% of the medications dispensed between January 8, 2016 and May 27, 2016.  As noted above, this was done in violation of both Florida and Minnesota law.  *See, e.g.,* Fla. Stat. 627.6131; *see also* Minn. Stat. § 151.60, *et seq.*

266.    In fact, Prime withheld payment for those prescription claims before initial audit findings were even issued.

267.    The audit procedure that Prime followed and the results were conducted unlawfully and in bad-faith.

268.    Prime committed at-least 60 separate violations of law throughout its audit and appeals process.

269.    Prime's purported bases for refusing to pay for the medications that PSP dispensed to Prime's beneficiaries were concocted for the purpose of refusing payment when services were actually rendered.

270.    Prime has received benefits from PSP, including but not limited to, the benefit of PSP's dispensing prescriptions to Prime's beneficiaries.

271.    Upon information and belief, Prime received payment for PSP's At-Issue Claims and retained that payment.

272.    Prime is well aware of the benefits that it received.

273.    Prime has intentionally retained such benefits.

274.    Under the circumstances of this case, it would unjust and inequitable to allow Prime to retain the benefits that it has received from PSP.

275.    Wherefore, PSP is entitled to a judgment for the value of the At-Issue Claims together with interest, costs, attorney fees, and damages resulting from unjust enrichment.

### Count IX - Contract Implied-in-Law

276.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

277.    PSP has conferred benefits on Prime.

278.    Prime is aware of the benefits that PSP conferred on it.

279.    Prime has accepted and retained these benefits.

280.    The circumstances of this matter are such that it would be inequitable for Prime to retain the benefits without paying fair value for them.

281.    For example, but not by way of limitation, PSP has provided Prime's members with prescription medications and Prime has collected money from health insurers and other payors as a result.

282.    Upon information and belief, Prime has retained the all or part of money that it received as the result of PSP dispensing such prescriptions.

283.    PSP spent hundreds of thousands of dollars for the wholesale supply of medications that it dispensed.

284.    Prime has refused to pay PSP based on technicalities that have nothing to do whether the patients actually received the medications that were claimed.  This includes alleged technical errors such as identifying a prescription as being phoned vs. faxed.

285.    Prime has engaged in a pattern of unlawful conduct in order to avoid paying PSP for the drugs that it dispensed.

286.    Under the circumstances of this case, it would be unjust to allow Prime to retain the money that it owes to PSP.

287.    Wherefore, PSP is entitled to a judgment for the value of the At-Issue Claims together with interest, costs, attorney fees, and all damages resulting from Prime's conduct.

## Count X - Breach of Contract – Electronic Interface

288.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

289.    PSP and Prime formed contracts by agreeing to the price and other key terms using an electronic interface when PSP dispensed prescriptions to Prime's members.

290.    PSP dispensed the prescriptions for the At-Issue Claims as set forth in that electronic interface.

291.    Prime failed to pay PSP for the At-Issue Claims.

292.    Furthermore, Prime failed to reject the prescriptions or the At-Issue Claims within a reasonable time.

293.    Accordingly, Prime breached contract(s) with PSP.

294.    As the direct and proximate result of Prime's breaches, PSP has suffered damages.

295.     Wherefore, PSP is entitled to a judgment for damages together with interest, costs, and attorney fees.

<u>**Count XI - Breach of Contract – 2007 Trinet Agreement**</u>

296.     Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

297.     To the extent that that the 2007 Trinet Agreement (**Exhibit D**) governs the relationship between PSP and Prime, Prime breached that Agreement.

298.     The 2007 Trinet Agreement was a contract.

299.     Even if, *arguendo*, the 2007 Trinet Agreement is enforceable against PSP, PSP satisfied all conditions precedent to receive payment for the At-Issue Claims and to remain the Prime's provider network.

300.     For example, and not by way of limitation, PSP fulfilled the requirement under Section 5.3, that it cooperate "in all audit programs and processes."

301.     As described above, PSP cooperated actively in Prime's audit process until Prime concluded that process on April 20, 2017.

302.     Nonetheless, Prime breached the 2007 Trinet Agreement.

303.     Prime's breaches of the 2007 Trinet Agreement include, but are not limited to:

    a.   Failing to pay PSP's claims within 30 days in violation of Section 3.1;

    b.   Conducting 25 blanket audits of PSP in violation of Section 5.2;

    c.   Refusing to cooperate in the audit process in good-faith by intentionally delaying results in violation of Section 5.3;

    d.   Intentionally delaying audit appeals results for more than a year until April 20, 2017;

    e.   Refusing to consider audit appeals in good-faith, rejecting PSP's At-Issue Claims, and finalizing the recoupment of over $700,000 on April 20, 2017.

304.    Furthermore, each of Prime's violations of state law is also a breach of the 2007 Trinet Agreement.

305.    Section 2.3 The 2007 Trinet Agreement requires Prime to "comply with any and all federal, state, and local laws, regulations and ordinances[.]"

306.    Furthermore, material compliance with the law is an implied term in all contracts.

307.    Prime's violations of law, including but not limited to those explained in Counts I through V above, were also material breaches of the 2007 Trinet Agreement.

308.    Prime has an **<u>uncontestable</u>** obligation to pay PSP for many of the At-Issue Claims under Fla. Stat. § 627.6131.

309.    Prime also had a duty to pay PSP within 45 days after the conclusion of the audit appeals process on April 20, 2017.  Minn. Stat. § 151.67(d).

310.    Prime has breached other duties that it owes under law to PSP, including but not limited to:

    a.   Delaying the audit appeals process beyond a 60-day statutory deadline to the detriment of PSP (Minn. Stat. § 151.67(a));

    b.   Refusing to pay PSP within 30 days under prompt-pay laws;

     c.   Denying claims in the April 20, 2017 final audit results on the basis of technical, clerical, scrivener's, typographical, and/or computer errors; and

     d.   Denying claims in the April 20, 2017 final audit results when those claims resulted in no financial harm to the patients, payors, or Prime.

311.    Furthermore, the 2007 Trinet Agreement includes an implied covenant of good-faith and fair dealing.

312.    Prime breached the covenant of good-faith and fair dealing.

313.    Most notably, but not by way of limitation, Prime breached such covenant when it refused to consider PSP's audit appeals in good-faith and finally denied those claims on April 20, 2017.

314.    Finally, Prime breached the 2007 Trinet agreement in other ways that are known to Prime and fairly encompassed within this Complaint.

315.    As the direct and proximate result of Prime's breaches of contract, PSP has suffered damages including, but not limited to:

     a.   Loss of payment for the At-Issue Claims;

     b.   Loss of customers;

     c.   Loss of business opportunities;

     d.   Cash-flow interruption and resulting business injuries;

     e.   Legal expense;

     f.   Loss of staff resources; and

     g.   Loss of income, interest, and the time-value of money.

316.    As the direct and proximate cause of Prime's breaches, PSP was damaged in an amount for in excess of $700,000.

317.    The 2007 Trinet Agreement would specifically permit the award of legal fees.

318.    Wherefore, PSP is entitled to a judgement for damages together with interest, costs, and attorney fees.

## Count XII - Breach of Other Contract

319.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

320.    PSP and Prime had a contract.

321.    PSP agreed to dispense prescriptions to Prime's beneficiaries and, in return, Prime agreed to pay PSP.

322.    PSP dispensed prescriptions to Prime's beneficiaries.

323.    PSP performed all other necessary tasks and completed all conditions precedent under that contract.

324.    Prime breached the contract by, *inter alia*, denying payment to PSP, violating applicable law, refusing to conduct audit appeals in good faith, wrongfully terminating PSP from its network, and ultimately refusing to pay PSP for the At-Issue Claims at the conclusion of the audit process on April 20, 2017 (or 45 days thereafter).

325.    As a direct and proximate cause of Prime's breaches of such contract, PSP has suffered damages in excess of $700,000.

326.    Wherefore, PSP is entitled to a judgment for damages together with interest, costs, and attorney fees.

### Count XIII - Equitable Estoppel

327.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

328.    Prime is or should be equitably estopped from claiming that PSP has lost, foregone, or waived any rights that were the result of Prime's actions.

329.    Prime took active steps to hinder and delay PSP's attempts to assert its rights.

330.    Under the circumstances, it would be unjust and inequitable to allow Prime to benefit from its actions.

331.    For example, and not by way of limitation, Prime should be equitably estopped from asserting any time-based defenses against any of PSP's legal, equitable, or contractual claims.

332.    As described above, Prime demanded that PSP cooperate with its full audit process.

333.    Prime withheld PSP's payments pending the final audit appeal results.

334.    Furthermore, Prime withheld its determination of PSP's appeal of termination from Prime's network until after the final audit results were issued.

335.    Prime represented to PSP that it would have a fair opportunity to have its claims and appeals considered.

336.    Thereafter, Prime intentionally dragged the audit and appeals process out for over a year, and only issued final results on April 20, 2017.

337.    Prime deliberately caused PSP to delay taking action by dragging this audit and appeals process out for an unreasonable length of time.

338.    Accordingly, Prime is estopped from relying on any time-based defenses for any claims or causes of action that accrued prior to April 20, 2017.

339.    Under applicable law, the elements of equitable estoppel are questions of fact.

340.    Discovery will demonstrate that Prime intended its action to cause PSP to delay and otherwise forgo asserting rights.

341.    Wherefore, PSP is entitled to a judgment or ruling that Prime is equitably estopped from asserting that PSP waived any right that was due to Prime's actions.  This includes, but is not limited to, a judgment that equitably estops and time-based defenses raised by Prime.

## **Count XIV - Equitable Tolling**

342.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

343.    Any and all time-based defenses that Prime asserts should be equitably tolled.

344.    Prime represented to PSP that its audit appeals and termination appeal would be reviewed by Prime in good-faith.

345.   It was not until April 20, 2017, when the final audit results were issued, that PSP became fully aware of Prime's bad-faith conduct.

346.   Until April 20, 2017, PSP did not know whether Prime would consider its appeals in good-faith.

347.   On April 20, 2017, however, Prime demonstrated its bad-faith in issuing final audit results that continued to rely on technicalities and reject substantial performance.

348.   Prime continued to reject At-Issue Claims based on alleged technical, clerical, and similar errors in violation of law.

349.   Prime continued to reject At-Issue Claims that had not caused any financial harm to patients, payors, or Prime in violation of law.

350.   It is not clear to PSP when Prime specifically made the decision to ignore PSP's substantial performance and ignore legal requirements.

351.   On April 20, 2017, however, PSP discovered that Prime had made these bad-faith choices and based the final audit findings on such bad-faith choices.

352.   It has been less than a year since Prime issued its final audit results.  In the interim, PSP has attempted pre-litigation dispute resolution with Prime to no avail.

353.   Under these circumstances, any time-based defenses should be equitably tolled.

354.   Wherefore, PSP is entitled to judgment or ruling that equitably tolls all time-based defenses.

## Count XV – Fraud, Misrepresentation, and Fraudulent Concealment

355.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

356.    As noted above, Prime acted in bad faith when rejected PSP's substantial performance and unlawfully rejected At-Issue Claims in the final audit results on April 20, 2017.

357.    Prime concealed its intention and choice to deny and reject all At-Issue Claims without having any intention of considering PSP's appeals in good-faith.

358.    During the audit and appeals process, however, Prime affirmatively stated that PSP would have a full and fair opportunity to appeal its termination for Prime's network and appeal Prime's rejections of the At-Issue Claims.

359.    Prime never intended to give PSP a full and fair chance in any of the appeals.

360.    PSP relied on Prime's fraudulent representations, however, and participated in Prime's appeal processes.

361.    PSP incurred substantial expenses and delayed taking action based upon Prime representations.

362.    Prime was damaged as the direct and proximate result of Prime representations.

363.    Wherefore, PSP is entitled to a judgment for damages together with interest, costs, and attorney fees.  PSP is further entitled to a judgement or ruling that prohibits Prime from relying on any time-based defenses.

### Count XVI – Antitrust Violations

364.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein and, to the extent necessary, pleads this Count in the alternative.

365.    The actions of Prime and Walgreens violated § 1 of the Sherman Act, 15 U.S.C. § 1, because they entered into a combination and agreements to unreasonably restrain trade and/or commerce.

366.    Such agreements included, but were not limited to, the plan to vertically integrate over 90% of Alabama's prescription drug benefits and exclude PSP from dispensing prescriptions to patients in the Relevant Markets through interstate commerce.

367.    Prime's actions violated § 2 of the Sherman Act, 15 U.S.C. § 2, because it has monopolized and/or attempted to monopolize the Relevant Markets.

368.    The actions of Prime and Walgreens also violated § 2 of the Sherman Act, 15 U.S.C. § 2, because they combined, conspired, and agreed to monopolize the Relevant Markets.

369.    Given the market power that Walgreens and Prime each possess, there is a dangerous probability that they will succeed in monopolizing the Relevant Markets, to the extent that their monopolization is not already complete.

370.    Furthermore, Prime is already a monopsony in the Relevant Markets, including the Alabama retail pharmacy market and the Alabama specialty and mail-order pharmacy market.

371.    Prime has now entered into a joint-venture with Walgreens to control the Relevant Markets.

372.    Accordingly, there is a real danger that Prime will succeed in monopolizing the Relevant Markets.

373.    Prime took exclusionary steps toward PSP as the result of its specific intent to monopolize the Relevant Markets and its combination, agreements, and conspiracy to monopolize the Relevant Markets.

374.    Prime terminated PSP from its network based on unlawful, bad-faith, pretextual audits in order to eliminate PSP as a competitor.

375.    The actions of Prime, Walgreens, and AdvanceRx are, furthermore, violations of 15 U.S.C. § 14, because, *inter alia*, those parties all agreed to establish prices based upon the agreement or understanding the PSP would be excluded from Prime's network.

376.    As the direct and proximate result of Prime's actions, PSP has suffered damages.

377.    PSP has a private right of action against Prime for its violations of federal antitrust laws.

378.    Without limitation, PSP may bring a private cause of action under 15 U.S.C. § 15, giving PSP a right to treble damages, costs, attorney fees, and interest.

379.    Wherefore, PSP is entitled to a judgment in the amount of three times its actual damages together with interest, costs, and attorney fees.

## VI.    **<u>JURY DEMAND</u>**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, PSP prays for the rulings, declaratory relief, and judgments identified in each Count of this Complaint.  Without limiting the foregoing, PSP prays for a judgment for three times its damages (which are in excess of $700,000), interest, costs, attorney fees, punitive damages, exemplary damages, statutory damages, restitution, and consequential damages and this prayer for relief is explicitly made with respect to each and every cause of action and/or Count in this Complaint.

Dated: April 20, 2018

**/s/Kristen G. Marttila**
Kristen G. Marttila, MN #0346007
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
kgmarttila@locklaw.com

Adrienne Dresevic, MI #P64873
(*pro hac vice* admission pending)
Robert Dindoffer, MI #P72319
(*pro hac vice* admission pending)
**THE HEALTH LAW PARTNERS**
32000 Northwestern Highway, Suite 240
Farmington Hills, MI 48334
Telephone:  (248) 996-8510
Facsimile:  (248) 996-8525
adresevic@thehlp.com
rdindoffer@thehlp.com

**ATTORNEYS FOR PLAINTIFF**