## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Physician Specialty Pharmacy, LLC, | No. 18-cv-1044 (MJD/TNL) |
| Plaintiff, | |
| | **REPORT** |
| v. | **AND RECOMMENDATION** |
| Prime Therapeutics, LLC, | |
| Defendant. | |

Adrienne Dresevic & Robert J. Dindoffer, The Health Law Partners, P.C., 32000 Northwestern Highway Suite 240, Farmington Hills, MI 48334 and Elizabeth R. Odette & Kristen G. Marttila, Lockridge Grindal Nauen P.L.L.P., 100 Washington Avenue South, Suite 2200, Minneapolis, MNN 55401 (for Plaintiffs); and

Christine Lindblad, Meghan M.A. Hansen, Ellie J. Barragry, & Alex L. Rubenstein, Fox Rothschild LLP, 222 South Ninth Street, Minneapolis, MN 5540 (for Defendants).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 18) and Plaintiff's Motion in Limine Regarding June 30, 2016 Settlement Demand Letter. (ECF No. 35). These motions have been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Michael J. Davis, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. (ECF No. 25). Based on all the files, records, and proceedings herein, and for the reasons set forth below, this Court recommends that Defendant's motion be **GRANTED** and Plaintiff's Motion be **DENIED AS MOOT.**

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Physician Specialty Pharmacy, LLC ("PSP"), is a specialty pharmacy located in and organized pursuant to the laws of Florida. Amend. Compl. ¶ 13. (ECF No. 6). Because PSP is located on the Florida-Alabama border, a substantial number of its customers come from Alabama. Prime Therapeutics ("Prime") is a pharmacy benefit manager located in Minnesota that is owned by nine health plans that are members of the Blue Cross Blue Shield Association. *Id.* at ¶ 14, 16. Prime manages the prescription drug benefits for Blue Cross and Blue Shield of Alabama, a health insurance provider that controls 93 percent of large-group health benefits in Alabama. *Id.* at ¶¶ 17, 144-45.

For several years, PSP filled prescriptions claims for Prime's beneficiaries. *Id.* at ¶ 26. When a Prime member used PSP to fill a prescription, PSP would use an electronic interface to submit a claim to Prime. *Id.* at ¶ 47. Prime would then tell PSP what amount Prime would reimburse PSP for the prescription and what amount the member would pay for the prescription. *Id.* Once Prime processed the prescription, it received payment from the member's health insurance plan. *Id.* at ¶ 48.

Beginning at the end of 2015 and continuing into 2016, Prime began to conduct a series of audits into PSP's business. *Id.* at ¶ 27. The first batch of audits began on December 14, 2015 and covered claims submitted between November 30, 2014 and November 30, 2015. *Id.* at ¶ 77. The second batch of audits began in January 2016 and covered claims between December 12, 2015 and January 8, 2016. *Id.* The final batch of audits began in the first half of 2016 and covered all claims submitted between January 8, 2016 and May 27,

2016. *Id*. While Prime conducted these audits, it refused to pay PSP for any prescription that PSP dispensed to a Prime member. *Id*. at ¶ 78.

Prime issued its findings for the first two batches of audit results in April 2016. *Id*. at ¶ 81. It rejected over $300,000 worth of claims that PSP submitted to Prime for reasons including incorrect entry of an origin code and using drug wholesalers that Prime had excluded, despite the fact that Prime never notified PSP of those exclusions. *Id*. at ¶¶ 83-85. Prime informed PSP that it would need to submit to an "administrative audit appeal process" if it wanted to receive payment for the rejected claims. *Id*. at ¶ 87.

Before PSP could appeal, however, and before Prime issued the results of its final batch of audits, Prime terminated PSP from its pharmacy network for "poor audit performance." *Id*. at ¶ 88-89. PSP subsequently appealed both the first two audit batches and its termination from Prime's network. *Id*. at ¶¶ 93-94. A few months after PSP appealed, Prime issued its results for the third batch of audits. *Id*. at ¶ 95. It rejected more than $500,000 worth of PSP's claims for technical and clerical errors. *Id*. at ¶ 98-99. Prime also rejected PSP's appeals of its first two batches of audit results, but gave PSP the opportunity for a final appeal, as required by state law. *Id*. at ¶ 101-02. Around the same time, Prime announced a partnership with Walgreens to provide specialty pharmacy and mail service businesses. *Id*. at ¶ 171.

PSP submitted its final appeal of the first batch of audit results and its first appeal of the third batch of audit results on September 3, 2016. *Id*. at ¶¶ 104-05. It also submitted a final appeal of the second batch of audit results on September 16, 2016. *Id*. ¶ 106. Prime denied PSP's first appeal of the third batch of audit results and asked for amended final

appeals of the other two batches on November 23, 2016. *Id*. at ¶¶ 107-08. PSP filed a final appeal of the third batch of audit results and supplemental information on the other two batches of audit results on December 23, 2016. *Id*. at ¶ 110. It also submitted additional information regarding the third batch of audit results on January 11, 2017. *Id*. at ¶ 112.

On April 3, 2017, Prime announced the creation of AllianceRx, a joint venture with Walgreens to provide specialty and mail-order pharmacy services. *Id*. at ¶¶ 159-60. A few weeks later, Prime issued its final audit results regarding PSP's claims. *Id*. at ¶ 117. Prime rejected over $700,000 worth of claims. *Id*. at ¶ 118. Shortly thereafter, Prime also rejected PSP's appeal of its termination from Prime's network. *Id*. at ¶ 124. PSP subsequently requested a dispute resolution conference, at which an attorney for Prime indicated that she did not know of any PSP claims where the patient did not receive the medication that was billed or prescribed. *Id*. at ¶ 131.  PSP alleges that Prime used the audits as a pretext to terminate PSP from its network for the benefit of AllianceRx.

PSP filed suit, alleging that Prime violated Minnesota and Florida state law and federal antitrust law. PSP alleged that Prime and Walgreens unlawfully restrained trade in the Alabama specialty/mail-order pharmacy markets and the retail pharmacy market by vertically integrating over 90 percent of Alabama's prescription drug benefits and by excluding PSP from dispensing prescriptions to Prime members. *Id*. at ¶ 364-66. PSP also alleged that Prime and Walgreens combined, conspired, and agreed to monopolize the Alabama specialty/mail-order pharmacy market and the Alabama retail pharmacy market and that Prime attempted to monopolize or monopolized the same markets. *Id*. at ¶¶ 367-74.

Prime moved to dismiss the complaint. (ECF No. 18). Attached to a declaration in support of its motion was a settlement demand letter from PSP, dated June 30, 2016. (ECF No. 21-3). PSP subsequently moved to exclude that letter from evidence. (ECF No. 35). At the hearing, the Court ordered the parties to provide supplemental letter briefing on a number of issues. The parties submitted those letters on October 1 and 9, 2018, following which the Court took the matter under advisement.

## II.   MOTION TO DISMISS

Prime has moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6) and 12(b)(1). When determining a Rule 12(b)(1) motion, courts "must distinguish between a 'facial attack' and a 'factual attack' on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). "In a facial attack, 'the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).'" *Id.* "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.*

In deciding a Rule 12(b)(6) motion, a court accepts as true all well-pleaded factual allegations and then determines "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). In doing so, the court must draw reasonable inferences in the plaintiff's favor. *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Sletten & Brettin Orthodontics v. Cont'l Cas. Co.*, 782 F.3d 931, 934 (8th Cir. 2015) (citation and internal quotations omitted). Facial plausibility of a claim exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Although a sufficient complaint need not be detailed, it must contain "[f]actual allegations . . . enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). Complaints are insufficient if they contain "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

## A. Federal Law Claims

PSP first contends that Prime and Walgreens violated Section 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Despite its broad language," Section 1 applies only to "unreasonable" restraints of trade or commerce. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004) ("*Craftsmen I*"). In order to evaluate whether PSP has pled facts showing the alleged contract, combination, or conspiracy is unreasonable, the Court must first identify what legal standard governs the challenged conduct. *Id*. at 773.

The default standard for evaluating whether conduct violates Section 1 of the Sherman Act is the "rule of reason." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). To successfully plead a case under the rule-of-reason standard,

a plaintiff must allege facts showing that the challenged conduct has "detrimental effects" upon competition. *Flegel v. Christian Hosp., NE-NW*, 4 F.3d 682, 688 (8th Cir. 1993). Traditionally, a plaintiff pleads such a case by first alleging sufficient facts to define a relevant market, which is composed of both a product and geographic market. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007) ("*Craftsmen II*"). The plaintiff then performs "an inquiry into market power and market structure designed to assess the [conduct's] actual effect." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). This inquiry requires consideration of a number of factors, "including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). This is a very "challenging" standard for a plaintiff to meet. *Craftsmen II*, 491 F.3d at 388.

In some cases, however, a truncated, "quick look" rule-of-reason standard applies. *See Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The quick-look standard applies when a person "with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 770. Typically, the quick rule standard applies when there are facts pled that show "genuine adverse effects on competition," such as a "naked restriction on price or output." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986). In these cases, because the "anticompetitive effects can easily be ascertained," *Calif Dental Ass'n v. FTC*, 526 U.S. at 770, there is no need to conduct an "elaborate market analysis." *Ind. Fed'n of Dentists*, 476 U.S. at 461. Instead, upon a showing of anticompetitive effects, the burden turns

immediately to the defendant to show some form of pro-competitive justification for the conduct. *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 113 (1984) ("*NCAA*").

Finally, some restraints are considered unreasonable "*per se*." *Leegin*, 551 U.S. at 886. The *per se* standard applies to restraints that "always or almost always tend to restrict competition and decrease output." *Id*. Such restraints include horizontal agreements between competitors to fix prices, divide markets, or boycott certain firms. *Id*.; *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 707 (D. Minn. 2011). Because these categories of restraints are "so strongly linked with anti-competitive activity and their economic impact so immediately obvious . . . the plaintiff meets its burden of proving the unreasonableness of the restraint merely by proving the existence and substance of the restraint itself." *Craftsmen II*, 491 F.3d at 387.

PSP contends that the *per se* standard should apply here, citing caselaw holding that the *per se* standard applies to conspiracies between firms to exclude another from the marketplace, so long as the conspirators possess "market power or exclusive access to an element essential to effective competition." *Johnson Bros.*, 830 F. Supp. 2d at 707; *see also Silver v. New York Stock Exchange*, 373 U.S. 341, 347-48 (1963). But the *per se* standard applies to those types of conspiracies only when the conspirators directly compete with one another. *See Johnson Bros.*, 830 F. Supp. 2d at 700 (considering agreement between two producers of alcoholic beverages). This is not such a case. PSP does not allege that Walgreens and Prime compete directly with one another. Instead, PSP alleges that Prime is a customer or purchaser of pharmacies like PSP and Walgreens. And when there is an

agreement between a buyer and a seller to exclude another entity from the market, the *per se* rule is inapplicable. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136-37 (1998) (explaining that the freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage). Instead, such agreements are subject to a rule-of-reason analysis. *Lomer Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987). The Court will therefore apply that standard to PSP's Section 1 claim.

The next question is whether the traditional, more extensive rule-of-reason standard should apply or whether the conduct should be evaluated under the truncated, quick-look standard. Neither party appears to argue that the quick-look standard is appropriate. And the facts as pled do not establish the type of "naked restraint on price [or] output" that would mandate such an analysis. *NCAA*, 468 U.S. at 110. PSP does not allege any facts to show that prices have been affected dramatically or that output has decreased. And other courts have declined to apply the quick-look standard to vertical restraints, including exclusive dealing arrangements. *See Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 758, 770 (E.D. Ill. 2015 (declining to apply quick-look standard to vertical price restraints); *Acton v. Merle Norman*, No. cv-88-7462, 1995 WL 441852 *8, (C.D. Cal. May 16, 1995) (noting that the Ninth Circuit has never approved of the quick look approach for such restraints). Accordingly, PSP has not alleged sufficient facts to show the challenged conduct has "obvious anticompetitive effects." *Law v. National Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir. 1998). Thus, this case is subject to traditional rule-of-reason analysis.

Because the traditional rule-of-reason standard applies, PSP must allege sufficient facts to define a relevant product and geographic market. *Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). The relevant product market must be broad enough to include only those products that are reasonably interchangeable. *Id*. The geographic market must encompass the "area in which consumers can practically seek alternative sources of the product." *Id*. Though "proper market definition can typically be determined only after a factual inquiry into the commercial realities faced by consumers," courts have not imposed "a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market" under Rule 12(b)(6). *Id*. (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)). In this case, PSP alleges two relevant markets: (1) the Alabama retail pharmacy market and (2) the Alabama specialty and mail-order pharmacy market.

As pled, the geographic market for both relevant markets fails. PSP contends the geographic market encompasses the entire state of Alabama because Alabama controls access to the relevant markets by licensing and regulating pharmacies. But a properly pled geographic market must not only encompass the area in which the seller is able to operate lawfully. It must also be limited to the area where "the purchaser can practicably turn for supplies." *Tampa Elec. Co. v Nashville Coal Co.*, 365 U.S. 320, 327 (1961). As pled, PSP does not allege any facts that show that a purchaser of retail pharmacy or specialty/mail-order pharmacy services could practicably turn to any other similar pharmacy in the state of Alabama to obtain those services.

There are two distinct types of purchasers of retail or mail-order/specialty pharmacy services. The first type is individual patients, who use retail, mail-order, and specialty pharmacy services to fill their prescriptions. The second type is pharmacy benefit managers, like Prime, who seek to create a network of pharmacies that their members can use to fill their prescriptions. As pled, PSP alleges that a patient who fills his or her prescription at a retail or specialty pharmacy located on the western border of Alabama could reasonably turn to a similar pharmacy located on the other side of the state to fill that prescription.[1] PSP's proposed geographic market also suggests that a pharmacy benefit manager could put together a viable retail or specialty/mail-order pharmacy network for its members by forgoing any pharmacy located in the northern part of the state and instead setting up a network composed entirely of pharmacies in the southern part of the state. But PSP does not allege any facts to support this. In fact, regarding the retail pharmacy market, PSP itself admits in its brief that patients "rarely leave their locality to obtain prescription medications." (ECF No. 29, p. 24). Thus, by PSP's own reasoning, a patient who lives on the western border of Alabama is unlikely to travel to the Florida/Alabama border, where PSP is located, to obtain pharmacy services. PSP's alleged geographic market is therefore not plausible.

The Alabama specialty and mail-order pharmacy market also fails because PSP does not plead sufficient facts to show that those two services should be combined into a single product market. The outer boundaries of a product market must be determined by

---

[1] A statewide geographic market might be plausible for mail-order pharmacies. But PSP does not allege a stand-alone Alabama mail-order market.

examining whether consumers would shift from one service to another in response to a change in the cost of the original service. *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007). Because PSP alleges that specialty and mail-order pharmacies form the same market, they must also allege facts that show it is plausible for a patient seeking mail-order pharmacy services to obtain the same services from a specialty pharmacy and vice versa. *See id*. PSP does not do so. Though PSP alleges that mail-order pharmacies provide specialty pharmacy services, including drug compounding, PSP does not allege that specialty pharmacies provide mail-order services or that a person who obtains non-specialty medications through a mail-order pharmacy could obtain those medications from a specialty pharmacy. Thus, as pled, PSP does not show how mail-order and specialty pharmacy services are interchangeable with one another.

The fact that Prime and Walgreens have developed a joint venture that encompasses both specialty and mail-order pharmacy services does not mean that those services are interchangeable for purposes of defining a plausible product market. It simply means that the joint venture offers two different service lines, each of which is interchangeable with its own market. But a person who requires mail-order prescription drug services could not obtain those services from a specialty pharmacy storefront. Thus, as pled, PSP fails to allege facts showing a plausible product market for mail order and specialty pharmacy services.

Even if PSP pled viable markets, its Section 1 claim would still fail because PSP has failed to demonstrate anticompetitive harm to those markets. Viewing the facts in a light most favorable to PSP, the only harm that it identifies is its own exclusion from the

market. But the loss of PSP by itself does not constitute the type of "significant anticompetitive effects" that Section 1 prohibits. *See Tanaka v. Univ. of Southern California*, 252 F.3d 1059, 1064 (9th Cir. 2001). Conduct does not cause significant harm to a market when it is alleged to have impacted only a single party, even if the purpose of the conduct is retaliation. *Id.* Instead, the plaintiff must show harm to competitive conditions in the defined markets. *Id.* In this case, PSP only pleads that it is the victim of a conspiracy intended to drive it out of the relevant markets. That, without more, is insufficient to establish a Section 1 claim. *See TheMLSonline.com, Inc. v. Regional Multiple Listing Service of Minnesota, Inc.*, 840 F. Supp. 2d 1174, 1181-82 (D. Minn. 2012). The conduct that PSP describes might be prohibited by other laws, including "business tort laws." *NYNEX*, 525 U.S. at 137. But that does not mean it is unlawful under antitrust law.

In addition, the facts as pled by PSP do not support its claim that it was, or would have been, excluded from the relevant markets. PSP alleges that Prime controls over 90 percent of the relevant markets because it is the exclusive pharmacy benefit manager for Blue Cross and Blue Shield of Alabama, which controls 93 percent of large group health benefits in Alabama. In support of this allegation, PSP cites to a Kaiser Family Foundation ("KFF") study listing the market share for the three largest large group health plans in Alabama. PSP contends that because Prime has excluded PSP from Prime's network, Prime has virtually excluded PSP from the Alabama retail pharmacy and mail order/specialty markets.

For two reasons, the Court does not find PSP's allegations to be sufficient. First, the KFF report on which PSP relies is limited only to those persons with large group health insurance. According to that report, a person has large group health insurance only if he or she works for a firm with more than 100 employees. Kaiser Family Foundation, *Market Share and Enrollment of Largest Three Insurers-Large Group Market* (2016).[2] The number of persons in Alabama in 2016 with large group health insurance is approximately 530,000. *Id.* But the United States Census found there were 4,779,736 people in Alabama in 2010 and now estimates there are 4,887,871 people there as of July 1, 2018. United States Census Bureau, QuickFacts Alabama (2018).[3] That means there are more than 4 million Alabama residents who receive health insurance from some other source, including coverage through the individual markets, Medicare, Medicaid, a small group plan, or even a large group health plan that uses a different pharmacy benefit manager. PSP does not allege any facts to show that Prime dominates the pharmacy benefit market for those individuals, nor that show the conduct complained of prohibited PSP from operating in those markets and serving those customers. As a result, PSP cannot show that it was excluded from the relevant markets. For all of these reasons, the Court recommends that PSP's Section 1 claim be dismissed without prejudice.

---

[2] *Available at* https://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-market/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22alabama%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[3] *Available at* https://www.census.gov/quickfacts/al. The Court may take judicial notice of publicly-available data about the population. *Friends of Lake View School District Inc. No. 25 of Phillips County v. Beebe*, 578 F.3d 753, 762 n. 12 (8th Cir. 2009); *see also Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice").

PSP also alleges that Prime monopolized, or attempted to monopolize, the Alabama market for retail and specialty and mail-order pharmacy services, in violation of Section 2 of the Sherman Act.  To bring a monopolization claim under Section 2, a plaintiff must plead facts establishing that the defendant: (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Monopoly power is the power "to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956). To prevail on an attempted monopolization claim, a plaintiff must allege facts showing "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *General Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 803 (8th Cir. 1987).

In a traditional Section 2 monopolization case, a plaintiff establishes that the defendant possesses monopoly power by defining a relevant geographic and product market and then by pleading facts to show the defendant's share of that particular market. *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 345 (8th Cir. 1995). The same requirements apply to a plaintiff bringing an attempted monopolization case. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The analysis of the product and geographic market in a Section 2 claim is identical to the analysis required of those markets in a Section 1 rule-of-reason claim. *Compare id. with Double D*, 136 F.3d at 560. In this

case, PSP alleges the same geographic and product markets as it did for its Section 1 claim. Thus, PSP's Section 2 claim fails for the same reasons.

Even if PSP had pled sufficient facts to allege a plausible market, its claim would fail because PSP does not allege sufficient facts to show that Prime possesses monopoly power in either market. As with its Section 1 claim, PSP's monopoly power allegations are based largely on the KFF study related to large group health plans. And as discussed before, the KFF study relates only to a small subset of Alabama insureds. It is insufficient to establish that PSP has monopoly power in the relevant markets.[4]

Furthermore, the Court cannot conclude on the basis of the KFF study that Prime possesses over 90 percent market share of the retail pharmacy or mail-order/specialty pharmacy markets. Until its joint venture with Walgreens, Prime did not participate in either market. The KFF study that PSP relies on relates only to the market shares of health insurance providers, rather than the market shares of retail pharmacies, mail-order pharmacies, or specialty pharmacies. PSP appears to imply that because of the joint venture between Prime and Walgreens, Prime will obtain monopoly power in the relevant markets because Prime will require its customers to use only AllianceRx or other Walgreens pharmacies. But PSP does not plead any facts that show Walgreens' market share in the relevant markets, nor does PSP allege facts showing that it is plausible that Prime will require its members to use a Walgreens retail or AllianceRx. The Court therefore cannot

---

[4] For the same reasons, even if PSP had alleged facts showing, for purposes of its Section 1 claim, that Prime and Walgreens were direct competitors, PSP would not be able to show that the *per se* standard should apply to that claim because it does not allege facts showing the two possessed market power. *See Johnson Bros.*, 830 F. Supp. 2d at 707 (requiring proof of market power or exclusive access to an element necessary for competition for per se rule to apply to refusal to deal claim).

conclude that PSP has pled sufficient facts to show that Prime has monopoly power in the relevant markets.

A plaintiff can also prove monopoly power through direct evidence of a monopoly, which is typically established through actual control over prices or the actual exclusion of competitors. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999). If a plaintiff pleads sufficient facts to show that direct evidence of monopoly power exists, then the plaintiff is not required to plead a plausible geographic or product market, as is required in a traditional Section 2 claim. *Id*.

PSP, however, does not allege sufficient facts to show direct evidence of monopoly power. PSP does not plead with particularity anywhere in its complaint that prices will increase as a result of Prime's conduct. Nor can PSP show that it was excluded from operating as a pharmacy as a result of Prime's monopoly power. As discussed above, though Prime excluded PSP from Prime's network, PSP was free to continue operating in both of the relevant markets, serving patients who used other pharmacy benefit managers or had other sources of health insurance, such as Medicare or Medicaid. In fact, the facts as pled show that PSP continued to operate after Prime terminated PSP from its network until the Alabama Board of Pharmacy revoked PSP's license nearly five months later.[5]

In addition, like its Section 1 claim, the fact that Prime excluded PSP from its own network is insufficient to establish the type of exclusionary conduct that is necessary to allege direct evidence of monopoly power. "Generally, Section 2 of the Sherman Act does

---

[5] The Court will take judicial notice of the Alabama Board of Pharmacy's license verification for purposes of this motion to dismiss. *Stahl v. U.S. Dep't of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and thus may consider them on a motion to dismiss.")

not restrict the right 'of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 518 (8th Cir. 2018) (quoting *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). A limited exception to this principle exists only when the facts pled show that the defendant elected to forgo short-term benefits because "it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985). That exception, however, "is at or near the outer boundary of [Section] 2 liability." *Trinko*, 540 U.S. at 409. And in this case, PSP pleads no facts to show that Prime, Walgreens, or AllianceRx lost out on short-term profits or other benefits by its decision to terminate PSP from its network. Thus, PSP fails to show direct evidence of monopoly power. Its monopolization claim therefore fails.

PSP further alleges that Prime and Walgreens violated Section 2 of the Sherman Act by conspiring to monopolize the Alabama retail pharmacy and Alabama mail order and specialty pharmacy markets. To bring a conspiracy to monopolize claim, the plaintiff must allege facts showing concerted action undertaken with the specific intent to obtain a monopoly and at least one overt act committed in furtherance of the conspiracy. *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1182-83 (8th Cir. 1982). Though a conspiracy claim brought under Section 2 does not require proof of a relevant market in the same sense as required for actual and attempted monopolization cases, it does require some "minimal showing of product and geographic context . . . to ensure a claim is not based upon some abstract showing of unlawful intent." *Id*. There is little-to-no legal authority setting forth

the particular showing that PSP must make under *Alexander* to allege the appropriate product and geographic context. But for three reasons, the Court concludes that the showing must be substantially similar to what a plaintiff must plead to bring a monopolization claim.

First, other courts that have considered the standard articulated in *Alexander* have generally concluded that this decision is similar to those in other cases that required a relevant market to be pled. *See Auraria Student Housing at the Regency LLC v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1240 n. 5 (10th Cir. 2016) (concluding that nine circuits require a relevant market be defined or identified in some less rigorous fashion); *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 67 n. 16 (1st Cir. 2002) (stating that a number of decisions, including *Alexander*, "say that a relevant market is necessary"). At a minimum, these decisions suggest that a plaintiff must allege facts showing some sort of relevant market in order to plead a conspiracy-to-monopolize claim. In fact, these decisions suggest that even under *Alexander*, that market definition is close to, if not identical with, the standard required for Section 2 claims.

Second, the *Alexander* court also concluded that "an unlawful conspiracy under Section 2 necessarily violates Section 1 as an 'unreasonable' restraint of trade." 687 F.2d at 1193. Subsequent decisions from the Eighth Circuit make clear that, absent application of the *per se* or quick-look standard, a plaintiff must define a relevant product and geographic market to bring a Section 1 claim. *See, e.g. Double D*, 136 F.3d at 560. Thus, allowing a plaintiff to bring a conspiracy-to-monopolize claim under Section 2 without pleading some form of product or geographic market would be inconsistent with Eighth

Circuit precedent setting forth the necessary elements to bring a traditional rule-of-reason claim under Section 1. This further supports the requirement that a plaintiff plead a relevant geographic and product market.

Third, and certainly not least, United States Supreme Court precedent decided since *Alexander* casts doubt on *Alexander*'s conclusion that the relevant market need can be pled in a less rigorous fashion in a conspiracy-to-monopolize case. Section 2 prohibits any person from monopolizing, attempting to monopolize, or combining or conspiring with any other person to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. § 2. In *Spectrum Sports*, the Supreme Court considered whether a plaintiff needed to define a relevant market in order to plead an attempted monopolization claim. 506 U.S. at 457. The Supreme Court concluded that Section 2 required such a showing because the "any part" clause of that statute applied both to attempted monopolization cases and monopolization cases. *Id.* The Court explained that because it previously concluded that the "any part" clause required the pleading of a relevant geographic and product market in a monopolization case, it would require the same showing when pleading an attempted monopolization case. *Id.*

It "is evident from the text of [Section 2], the 'any part' language also applies to conspiracy-to-monopolize claims." *Auraria*, 843 F.3d at 1236. It is therefore "equally apparent then, that the 'any part' language does not excuse a plaintiff in a conspiracy to monopolize case from identifying the relevant market." *Id.*[6] Thus, in light of *Spectrum*

---

[6] The *Auraria* court also noted that it was the "minority position" to not require that a relevant market be defined in a conspiracy-to-monopolize case. 845 F.3d at 1241. The Court also noted that commentators had concluded that the "better reasoned decisions" required proof of a relevant market in such cases. 845 F.3d at 1239 n. 4.

*Sports*, the "any part" clause requires a plaintiff to plead a geographic and product market when bringing a conspiracy-to-monopolize case. *Id*. at 1237 (citing *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 61 (1911).

Taking the above factors into consideration, the Court concludes that PSP must define a market in the substantially same way that is required to in order to bring a monopolization or attempted monopolization claim. And as set forth above, PSP does not plead sufficient to facts to define a relevant market, nor show that it has been excluded from that market. Accordingly, the Court recommends that PSP's conspiracy to monopolize claim be dismissed.

Finally, PSP alleges that the actions of Walgreens, Prime, and AllianceRx violate Section 3 of the Clayton Act, 15 U.S.C. § 14. Section 3 makes it unlawful for any person engaged in commerce to set or offer discounts from prices based on the condition, agreement, or understanding that the purchaser would not use the competing products of a seller. PSP contends that the prices negotiated between Prime, AllianceRx, or Walgreens were based on the agreement or understanding that PSP would be excluded from Prime's network.

For a plaintiff to successfully plead a Section 3 claim, the plaintiff must allege facts that show that the contract or agreement forecloses competition "in a substantial share of the line of commerce involved." *Tampa Elec.*, 365 U.S. at 329. The primary factor in this determination is the definition of the relevant market. *Id*. The plaintiff must also show that "opportunities for other traders to enter into or remain in that market [are] significantly limited." *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 625 (8th Cir. 2011).

PSP's Section 3 claim fails for the same reasons as PSP's monopoly claim. As set forth above, PSP fails to plead facts establishing a relevant market or showing that opportunities in the market were significantly limited following the establishment of the joint venture between Prime and Walgreens. At most, PSP is able to show only that opportunities to participate in the relevant markets for large group health plans might be limited. And even assuming that Prime will require its beneficiaries to use Walgreens or AllianceRx going forward, PSP does not allege facts that show it is foreclosed from offering services in the relevant markets to customers with different sources of health insurance. Thus, the Court recommends that PSP's Section 3 claim be dismissed.

### B.  State Law Claims

PSP also pleads a number of state law claims. It contends that, even if the Court dismisses the federal law claims, the Court retains jurisdiction of these claims because the parties are diverse in citizenship and the amount in controversy is greater than $75,000. *See* 28 U.S.C. § 1332(a)(1). Prime contends that because it is an LLC and because one of its members is a citizen of Florida, diversity jurisdiction does not exist.

For diversity jurisdiction to exist, there must be "complete diversity of citizenship among the litigants." *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). An LLC's citizenship is the citizenship of each of its members. *Id*. Thus, if the citizenship of any LLC member is the same as the citizenship of any of the opposing parties, complete diversity of citizenship does not exist for purposes of diversity jurisdiction. *See id*.

In this case, the parties agree that PSP is a citizen of Florida, but dispute whether any of Prime's members are Florida citizens. At the hearing, Prime argued that Navigy Holding, Inc., a corporation organized pursuant to the laws of Florida, was a member of Prime. PSP agreed that Navigy was a Florida citizen for purposes of diversity jurisdiction but stated that it did not know whether Navigy was a member of Prime. Following the hearing, Prime submitted for *in camera review* a copy of a joinder agreement showing that Navigy Holding, Inc. was a member of Prime. (ECF No. 52). Prime also made a redacted version of this agreement available to PSP. (ECF No. 50). The Court has reviewed both the redacted and unredacted joinder agreements and concludes that either is sufficient to establish that Navigy is a member of Prime. Accordingly, the Court concludes that diversity jurisdiction does not exist between the parties.

Because diversity jurisdiction does not exist, the Court's original jurisdiction over this matter is based on the federal questions presented by PSP's Sherman and Clayton Act claims. The Court has supplemental jurisdiction over PSP's state law claims pursuant to 28 U.S.C. § 1367(a). Because the Court has now dismissed the claims arising under original jurisdiction, the Court may decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction after dismissing the only claims arising under its original jurisdiction, the Court must consider "the stage of the litigation; the difficulty of the state claim; the amount of judicial time and energy necessary for the claim's resolution; and the availability of a state forum." *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 5 F.Supp.2d 694, 711 (D. Minn. 1998), citing *Marshall v. Green Giant Co.,* 942 F.2d 539, 549 (8th Cir. 1991).

The "normal practice" is to dismiss supplemental state law claims when the federal claims are dismissed prior to trial. *Kapaun v. Dziedzic,* 674 F.2d 737, 739 (8th Cir. 1982). In this case, the remaining state claims turn solely on interpretations of state law relatively unrelated to the competition-related issues of PSP's antitrust claims. Litigation is also not that far along, as the pre-trial scheduling conference has not been held and the parties have not filed their Rule 26 report. Accordingly, the Court recommends that supplemental jurisdiction not be exercised over PSP's state law claims.

### C.  Leave to Amend

PSP asks that it receive leave to amend if the Court grants Prime's motion to dismiss. Federal Rule of Civil Procedure 15(a)(2) requires leave to amend be "freely give[n] when justice so requires." The purpose of the Federal Rules of Civil Procedure is to facilitate a proper decision on the merits of a claim, rather than on "mere technicalities." *Foman v. Davis*, 371 U.S. 178, 181 (1962). The Court believes justice supports providing one more opportunity for PSP to plead facts establishing a viable antitrust claim. The Court therefore recommends that PSP be given leave to amend the complaint.

## III.    MOTION IN LIMINE REGARDING SETTLEMENT DEMAND LETTER

In support of its motion to dismiss, Prime filed a June 30, 2016 letter that PSP's attorneys sent to Prime and Prime's counsel demanding the release of more than $1,000,000 that PSP claimed Prime wrongly held. Prime filed this letter in support of certain arguments it made regarding PSP's state law claims. PSP now moves to exclude that letter from the record pursuant to Federal Rule of Evidence 408.

Following dismissal of PSP's antitrust claims, the Court no longer has jurisdiction over PSP's state law claims. The Court therefore need not reach the substantive issues raised in PSP's motion. *See Grinnell Mut. Reinsurance Co. v. Moon*, 845 F. Supp. 2d 989, 994 (D. Minn. 2012) (declining as moot motion for summary judgment regarding state law cause of action that the court declined to exercise supplemental jurisdiction over). The Court recommends that Plaintiff's Motion in Limine be denied as moot.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 18) be **GRANTED** and the Amended Complaint be **DISMISSED WITHOUT PREJUDICE**.

2.  Plaintiff be given 30 days from the date of the District Judge's ruling on this Report & Recommendation to file an amended complaint.

3.  Plaintiff be given 45 days from the date of the District Judge's ruling on this Report & Recommendation to serve an amended complaint on Defendant.

4.  Plaintiff's Motion in Limine Regarding the June 30, 2016, Settlement Demand Letter (ECF No. 35), be **DENIED AS MOOT.**


[signature on next page]

Date: January 23, 2019                    _s/ Tony N. Leung_
                                        Tony N. Leung
                                        United States Magistrate Judge
                                        District of Minnesota

                                        *Physician Specialty Pharmacy, LLC v.*
                                        *Prime Therapeutics, LLC*

                                        No. 18-cv-1044 (MJD/TNL)


## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).