**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Physician Specialty Pharmacy, LLC,

          Plaintiff,

v.

Prime Therapeutics, LLC,

          Defendant.

No. 18-cv-1044 (MJD/TNL)


**REPORT**
**AND RECOMMENDATION**

---

Adrienne Dresevic & Robert J. Dindoffer, The Health Law Partners, P.C., 32000 Northwestern Highway Suite 240, Farmington Hills, MI 48334 and Elizabeth R. Odette & Kate M. Baxter-Kauf, Lockridge Grindal Nauen P.L.L.P., 100 Washington Avenue South, Suite 2200, Minneapolis, MNN 55401 (for Plaintiff); and

Christine Lindblad and Ellie J. Barragry, Fox Rothschild LLP, 222 South Ninth Street, Minneapolis, MN 55402 (for Defendant).

---

       This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 83) and Plaintiff's Motion in Limine to Exclude Settlement Demand Letter. (ECF No. 101). These motions have been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Michael J. Davis, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. (ECF No. 25). Based on all the files, records, and proceedings herein, and for the reasons set forth below, this Court recommends that Defendant's motion be **GRANTED** and Plaintiff's Motion be **DENIED AS MOOT.**

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Physician Specialty Pharmacy ("PSP") is a specialty pharmacy located in and organized pursuant to the laws of Florida. Sec. Amend. Compl. ¶ 13. (ECF No. 82). Because PSP is located on the Florida-Alabama border, a substantial number of its customers come from Alabama. *Id*. Prime Therapeutics ("Prime") is a pharmacy benefit manager ("PBM") located in Minnesota that is owned by nine health plans that are members of the Blue Cross Blue Shield Association. *Id*. at ¶¶ 14, 16. Prime manages the prescription drug benefits for Blue Cross and Blue Shield of Alabama, a health insurance provider that controls 95 percent of the Alabama commercial health insurance market. *Id*. at ¶ 17. Prime is "an essential customer for any pharmacy doing business near the Florida-Alabama border." *Id*. at ¶ 18. Prime also operates its own specialty and mail-order pharmacies. *Id*. at ¶ 20.

For several years, PSP filled prescriptions for Prime members. *Id*. at ¶ 25. But starting in December 2015, Prime conducted a series of audits into claims that it received from PSP for reimbursement. *Id*. at ¶ 80. The first audit began on December 14, 2015 and covered claims between November 30, 2014 and November 30, 2015. *Id*. at ¶ 81(a). The second audit began in January 2016 and encompassed claims between December 12, 2015 and January 8, 2016. *Id*. at ¶ 81(b). The third and final audit began in the first half of 2016 and covered claims submitted between January 8, 2016 and May 27, 2016. *Id*. at 81(c). While Prime conducted these audits, it refused to reimburse PSP for any prescription that PSP dispensed to a Prime member. *Id*. at ¶ 82.

Prime issued its results for the first two audits in April 2016. *Id*. at ¶ 85. For a number of reasons, including "alleged clerical errors and other minor technicalities," Prime rejected over $300,000 worth of claims. *Id*. at ¶ 87. PSP alleges that Prime acted unlawfully and in bad faith when it rejected PSP's claims. *Id*. at ¶¶ 87-90.

Prime told PSP that to receive payment for the rejected claims, PSP needed to submit to an "administrative audit appeal process." *Id*. at ¶ 91. Before PSP could begin this process, and before it received the results of Prime's final set of audits, Prime terminated PSP from its pharmacy network. *Id*. ¶¶ 92, 94. Prime explained that it terminated PSP for "poor audit performance." *Id*. at ¶ 93. In May 2016, PSP appealed the results of the first two audits that Prime conducted. *Id*. at ¶ 97. A few weeks after that, PSP appealed its termination from Prime's network. *Id*. at ¶ 98.

On August 4, 2016, Prime issued the results for the third audit. *Id*. at ¶ 99. It rejected more than $500,000 of PSP's claims. *Id*. at ¶ 102. As with the previous two audits, Prime again relied on "technical" and "clerical" errors to reject PSP's claims. *Id*. at ¶ 103. PSP alleges that these errors "had zero impact on the fundamental fact that patients actually received the prescriptions that PSP claimed." *Id*. at ¶ 103.

Prime also rejected PSP's appeals of the first two rounds of audits. *Id*. at ¶ 104. Prime gave PSP an opportunity for a final appeal. *Id*. at ¶ 106. PSP submitted its final appeal of the first two audits and its initial appeal of the third audit in September 2016. *Id*. at ¶¶ 108-10.

Approximately two months later, Prime rejected all but a small portion of PSP's appeal regarding the third audit. *Id*. at ¶ 111. Prime also invited PSP to submit additional

documentation regarding its final appeals of the first two audits. *Id*. at ¶ 112. In December 2016, PSP submitted additional documentation regarding the first two appeals as well as a final appeal of the third audit. *Id*. at ¶¶ 114-15. It provided additional information regarding its appeal of the third audit in January 2017. *Id*. at ¶ 116.

Prime issued its final results as to all three audits in April 2017. *Id*. at ¶ 121. It rejected more than $700,000 of PSP claims. *Id*. at ¶ 122. Shortly after issuing its audit results, Prime rejected PSP's appeal of its termination from Prime's network. *Id*. at ¶ 128. PSP alleges that "Prime never had any intention of considering PSP's appeals in good faith." *Id*. at ¶ 130.

While Prime was considering PSP's appeals, it was also negotiating an agreement with Walgreens to form a combined specialty and mail-order pharmacy called AllianceRx. *Id*. at ¶ 34. Prime and Walgreens announced the joint venture on April 3, 2017. *Id*. at ¶¶ 149-50. PSP alleges that Prime used their audits as a pretext to exclude PSP from the market and prevent it competing with AllianceRx. *Id*. at ¶ 153.

PSP and Prime engaged in a dispute resolution conference in March 2018. Following that, PSP filed suit, alleging that Prime violated federal antitrust and Minnesota and Florida state law. PSP amended its complaint on April 20, 2018. (ECF No. 6). Prime moved to dismiss the amended complaint. (ECF No. 18).

This Court recommended that the amended complaint be dismissed. *Physician Specialty Pharmacy, LLC v. Prime Therapeutics*, *LLC*, No. 18-cv-1044, 2019 WL 1239705, at *1 (D. Minn. Jan. 24, 2019) ("*PSP*"). Regarding PSP's antitrust claims, the Court concluded that PSP had not pled a proper *per se* claim; that PSP had not alleged

4

sufficient facts to establish plausible geographic and product market, as required to plead a viable rule of reason claim; and that PSP failed to demonstrate that it was excluded from its proposed markets. *Id*. at *5-*7. Because "justice support[ed] providing one more opportunity for PSP to plead facts establishing a viable antitrust claim," the Court also recommended that PSP be given leave to file an amended complaint. *Id*. at *11. The District Judge adopted this Court's recommendation. *Physician Specialty Pharmacy, LLC v. Prime Therapeutics*, *LLC*, No. 18-cv-1044, 2019 WL 139971, at *1 (D. Minn. Mar. 28, 2019)

PSP filed a Second Amended Complaint on April 23, 2019. (ECF No. 82). PSP alleged that Prime violated Sections 1 and 2 of the Sherman Act, Sections 3 and 7 of the Clayton Act, and Minnesota and Florida state law. Prime again moved to dismiss the Second Amended Complaint. (ECF No. 83).

In support of its motion to dismiss, Prime cited to documents issued by the Alabama Board of Pharmacy (ECF Nos. 86-5 & 86-6) and a pre-litigation settlement demand letter that PSP sent to Prime (ECF No. 86-3). PSP moved to exclude each document from consideration. (ECF Nos. 95 & 101). Before the June 25, 2019 motion hearing, the parties informed the Court they had resolved PSP's motion related to the Alabama Board of Pharmacy documents. Following the motion hearing, the Court took the matter under advisement.

## II.    MOTION TO DISMISS

As it did with the previous Complaint, Prime has moved to dismiss the Second Amended Complaint under Fed. R. Civ. P. 12(b)(6) and 12(b)(1). When considering a Rule 12(b)(1) motion, courts "must distinguish between a 'facial attack' and a 'factual attack'

5

on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir. 1990)). "In a facial attack, 'the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).'" *Id*. "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id*.

In deciding a Rule 12(b)(6) motion, a court accepts as true all well-pleaded factual allegations and then determines "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). In doing so, the court must draw reasonable inferences in the plaintiff's favor. *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sletten & Brettin Orthodontics v. Cont'l Cas. Co.*, 782 F.3d 931, 934 (8th Cir. 2015) (citation and internal quotations omitted). Facial plausibility of a claim exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Although a sufficient complaint need not be detailed, it must contain "[f]actual allegations . . . enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). Complaints are insufficient if they contain "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### A. Federal Antitrust Claims

#### 1. Section 1 of the Sherman Act

The Court first considers PSP's amended Section 1 claim under the Sherman Act. Section 1 makes unlawful all contracts, combinations, and conspiracies that unreasonably restrain trade. 15 U.S.C. § 1; *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004). As the Court explained in its previous Report and Recommendation, there are multiple levels of scrutiny that courts apply when analyzing a Section 1 claim. The Court will briefly summarize them again.

The default level of scrutiny is the rule of reason, which requires the plaintiff to show that the challenged conduct has "detrimental effects" upon competition. *Flegel v. Christian Hosp., NE-NW*, 4 F.3d 682, 688 (8th Cir. 1993). It requires the factfinder to consider "specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The second level of scrutiny is the "quick look" rule of reason, which does not require "elaborate industry analysis" because the anticompetitive effects of the challenged conduct "can easily be ascertained." *Calif. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986). The final and strictest level of scrutiny is the *per se* standard, which makes unlawful restraints that "always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citation omitted). The *per se* standard "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work[.]" *Id*. at 886. As before, the parties

7

dispute whether the alleged agreement between Prime and Walgreens is subject to *per se* or rule of reason scrutiny.

*Per se* scrutiny applies to several types of horizontal agreements, which are agreements between two or more parties at the same market level. *Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554, 558 (8th Cir. 1998). Rule of reason scrutiny applies to vertical agreements, which are agreements between parties at different market levels (i.e. between buyers and sellers). *Lomer Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987). In its previous Report and Recommendation, the Court concluded PSP did not plead a plausible *per se* claim. *PSP*, 2019 WL 1239705 at *4. The Court explained that because the facts alleged by PSP established an agreement between a PBM and a pharmacy services provider, PSP had pled a vertical agreement that merited rule-of-reason scrutiny. *Id*. Now, in its Second Amended Complaint, PSP emphasizes the fact that Prime owns mail-order and specialty pharmacies. PSP argues that because it has alleged that Prime and Walgreens both compete in the same market level, the Court should apply the *per se* standard to their agreement to exclude PSP from competition. PSP's argument is not persuasive.

An agreement is not subject to *per se* treatment simply because it is between parties who have business units at the same market level. For the *per se* standard to apply, the plaintiff must plead facts that show the agreement required the parties to take "concerted effort at a *single market level*."[1]  *Fine v. Barry and Enright Productions*, 731 F.2d 1394,

---

[1] For example, *per se* treatment might be warranted if two pharmacies agreed to pressure a pharmacy benefit manager not to do business with a third pharmacy.

1398 (9th Cir. 1984) (emphasis added); *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752, 776 (11th Cir. 1983); *see also ES Dev., Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547, 556-57 (8th Cir. 1991) (applying *per se* standard because evidence established parallel action between competing dealers). PSP must therefore allege facts that show the agreement required Prime and Walgreens pharmacies to take concerted action in order to plead a plausible *per se* claim.

PSP fails to do so. Instead of pleading facts that show coordinated action at the pharmacy services level, PSP alleges that the agreement required Prime to leverage its "control *over the buyer side* of the pharmacy services market to exclude competitors and enhance their control *over the seller-side* of those markets." Sec. Amend. Compl. ¶ 20 (emphasis added). This allegation is fatal to its *per se* claim. Not only does PSP concede that PBMs are not at the same market level as pharmacy service providers, PSP fails to allege any facts that show the alleged agreement required any action, let alone concerted action on the part of Walgreens or Prime pharmacies. The fact that both Prime and Walgreens each participate in the pharmacy-services market does not transform the alleged agreement from a vertical one to a horizontal one. *See Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir. 1981) (concluding that agreement between a manufacturer and distributor is vertical even if manufacturer participates in distribution market); *H &B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245-46 (5th Cir. 1978) (explaining that conspiracy between parties at different market levels of market is treated as horizontal only if conspiracy occurs at the same market level). PSP has therefore not pled a plausible *per se* claim under Section 1 of the Sherman Act.

Because neither party argues for application of the quick-look rule of reason standard,[2] the Court next considers whether PSP has pled a viable rule-of-reason claim. To plead a rule-of-reason claim, PSP must plead a plausible product and geographic market. *Double D Spotting Service*, 136 F.3d at 560. In its previous complaint PSP alleged two markets: (1) the Alabama retail pharmacy market and (2) the Alabama specialty and mail-order pharmacy market. *PSP*, 2019 WL 1239705 at *4. The Court identified a number of deficiencies relating to those proposed markets. In particular, the Court explained that PSP's proposed geographic market of the state of Alabama failed because PSP did not "allege any facts that show a purchaser of retail pharmacy or specialty/mail-order pharmacy services could practicably turn to any other similar pharmacy in the state of Alabama to obtain those services." *Id*. The Court further noted that PSP's alleged product market of specialty/mail-order pharmacy services failed because PSP failed to show how mail-order and specialty pharmacy services were interchangeable. *Id*.

PSP made substantial changes to its proposed markets following the Court's Report and Recommendation. Unfortunately, the way PSP's Second Amended Complaint is structured makes it difficult to determine whether PSP intended to plead product markets consisting of commercially-insured patients or whether it intended to plead markets consisting of all patients, regardless of their source of insurance. The Court thus provides the following analysis to explain why it interprets PSP's complaint as pleading markets that are limited to commercially-insured patients.

---

[2] Nor could they. As the Court noted previously, the quick-look standard does not apply to vertical restraints. *See PSP*, 2019 WL 1239705 at *4 (citing *Hannah's Boutique, Inc. v. Surdej*, 112 F. Supp. 758, 770 (E.D. Ill. 2015); *Acton v. Merle Norman*, No. Cv-88-7462, 1995 WL 441852, at *8, (C.D. Cal. May 16, 1995)).

PSP states that "the over-arching relevant Product market is the '**Commercial Pharmacy Market**,' which is the market for pharmacy services provided to commercially-insured patients/beneficiaries." Sec. Amend. Compl. ¶ 165 (Emphasis in original). PSP then alleges a series of submarkets. It first alleges that the Commercial Pharmacy Market is divided into submarkets based on the patient's insurance. PSP identifies these submarkets as the: (1) Large Group Pharmacy Market; (2) Small Group Pharmacy Market; and (3) Individual Pharmacy Market ("Insurance Submarkets"). Sec. Amend. Compl. ¶ 166(a). PSP then alleges the Commercial Pharmacy Market is divided into submarkets that are based on the pharmacy service the patient receives. PSP identifies these submarkets as the: (1) Specialty Pharmacy Services Market; (2) Specialty Drug Dispensing Market; (3) Mail-Order Pharmacy Market; and (4) Mailed-Specialty Pharmacy Market. ("Service Submarkets"). Sec. Amend. Compl. ¶ 166(b)-(e). Because PSP alleges that each submarket is a part of the Commercial Pharmacy Market, the Court would assume that each submarket is composed only of commercially insured patients.

PSP then alleges a series of sub-submarkets. PSP claims these markets are formed by combining an Insurance Submarket with a Service Submarket. Sec. Amend. Compl. ¶ 166 n. 4. For example, the Large Group Pharmacy Market could be combined with the Specialty Pharmacy Services Market to form the Large Group Specialty Pharmacy Services Market. PSP attached a summary of these sub-submarkets as Exhibit H to its complaint. (ECF No. 82-1, p. 52). Because PSP labeled Exhibit H as "Sub-Submarkets within Commercial Pharmacy Services Market," the Court would again presume that the alleged sub-submarkets consist only of commercially-insured patients.

While these allegations appear straightforward enough, PSP's subsequent allegations make it difficult for the Court to determine whether PSP actually intended to limit the Service Submarkets to patients with commercial insurance. Later in the Second Amended Complaint, for example, PSP provides additional information about its Service Submarkets. PSP alleges that one of the Service Submarkets, the Specialty Pharmacy Services Market, exists "*within the Commercial Pharmacy Market*." Sec. Amend. Compl. ¶ 187 (emphasis added). This allegation, like those PSP made previously, is consistent with the concept that PSP intended to plead commercial-only markets.

PSP then provides additional information about the three remaining Service Submarkets (the Specialty Drug Dispensing Market, Mail-Order Pharmacy Market, and Mailed-Specialty Pharmacy Market). Sec. Amend. Compl. ¶¶ 198, 208, 214. It does not allege that any of these submarkets exist within the Commercial Pharmacy Market. *Id.* Instead, PSP alleges that these submarkets are defined by the type of service offered to the patient. Taken literally, PSP's complaint could be read as taking the unusual approach of restricting one Service Submarket to commercially-insured patients, while expanding its remaining Service Submarkets to include patients of all types of insurance. This reading would of course be inconsistent with the allegations identified above that limited PSP's proposed submarkets to commercial insurance.

This lack of clarity is further amplified by contradictory statements that PSP made in its memorandum of law. PSP first argues that "exclusion from BCBS AL/Prime's *2 million Alabama beneficiaries and roughly 1 million commercially-insured Alabama beneficiaries* means that the return on investment for any advertising will be inadequate to

justify continuing Alabama operations." (ECF No. 91, p. 22) (emphasis added). This argument suggests that PSP intended its submarkets to include patients of all forms of insurance.

But PSP also argues that it faces "commercial realities" that "are vastly different" than other medical-related markets because it is unable to "generate substitute business from *non-commercial* customers." (ECF No. 91, p. 22-23) (emphasis added). It further claims that if "the relevant market for Section 2 analysis were expanded to *non-commercially-insured patients*, the Prime/Walgreens/AllianceRx combination would still possess monopoly power." (ECF No. 91, p. 27) (emphasis added). These two arguments contradict PSP's previous statement; they suggest that PSP intended to limit its submarkets to commercially-insured patients.

The contradictions in PSP's brief and complaint make it difficult for the Court to ascertain the proper product market in which to evaluate PSP's claims.[3] Ultimately, however, the Court cannot ignore the fact that PSP defined the "over-arching" product market to be the Commercial Pharmacy Market. Sec. Amend. Compl. ¶ 165. Nor can the Court disregard the fact that Exhibit H, which contains a list of all sub-submarkets "that are relevant to the instant action" is labeled as "Sub-Submarkets within *Commercial Pharmacy Services* Product Market." Sec. Amend. Compl. ¶ 166 n. 4. (ECF No. 82-1, p. 52) (emphasis added). The Court will therefore construe PSP's complaint as setting forth product markets that relate only to commercially-insured patients.

---

[3] They also cause the Court to question whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A product market is properly pled only if it includes all products that are reasonably interchangeable. *Double D Spotting Service*, 136 F.3d at 560 (8th Cir. 1998); *see also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) ("The focus is on how consumers will shift from one product to the other in response to changes in their relative costs.") (citation and internal quotation marks omitted). A product market is also properly pled only if it is defined from the perspective of the plaintiff. *Little Rock*, 591 F.3d at 597. That means when the plaintiff sells a service or product, the product market must include all purchasers for the plaintiff's goods or services that are reasonably interchangeable. *Id*. In the pharmacy services market, all potential customers are interchangeable, regardless of whether the customer uses private insurance, government insurance, or pays cash for his or her prescriptions. *Id*. As a result, PSP's proposed product market is too narrow because it fails to account for non-commercially insured customers who purchase PSP's products and services.[4]

Some courts, however, permit a plaintiff who sells goods or services to plead a product market composed of a specific subset of buyers (like customers with commercial insurance). *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004). Those courts require a plaintiff to demonstrate that special circumstances justify such a product market. *Id*. Typically, the type of special

---

[4] PSP should not be surprised by Prime's challenge to PSP's proposed product market. In the Court's previous Report and Recommendation, it noted that PSP's claim to be excluded from the market failed because PSP did not account for all the other customers to whom it could sell, including Medicare and Medicaid. *PSP*, 2019 WL 1239705, at *6. But rather than account for those patients in its amended complaint, PSP instead tries to "circumscribe the market to a few buyers in an effort to manipulate those buyers' market share." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008). As explained later, PSP has failed to establish that the product market should be limited to only commercially insured patients.

14

circumstances that justify a product market limited to a subset of buyers are when "the loss of high-profit sales unusually impairs the foreclosed rivals' survivability, . . . or where there is an inelastic difference in price between sales of a single product to a particular group of customers and sales of that same product to other customers[.]" *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-cv-1054, 2015 WL 1399229, at *6 (C.D. Ill. Mar. 25, 2015). As relevant here, that means if PSP can plead facts showing that access to commercially-insured patients is critical to a pharmacy's survival "in light of the comparatively low prices providers are required to charge patients covered by government plans for the same services," *id.* at *7, then PSP would justify a proposed product market consisting of only commercially-insured patients.

The Eighth Circuit has never decided whether special circumstances permit a plaintiff to plead a product market limited to a subset of buyers. But the Court need not resolve that question. Even assuming without deciding that the Eight Circuit would permit the pleading of special circumstances, the Court would still conclude that PSP failed to plead an adequate product market.

PSP relies on two allegations to argue that special circumstances justify its proposed product market. First, PSP alleges that Prime is an essential customer for mail order pharmacies doing business in Alabama. Sec. Amend. Compl. ¶ 18. Second, PSP alleges that without access to commercially-insured patients, it is "untenable" for a pharmacy to make the necessary investment needed to continue competing. Sec. Amend. Compl. ¶ 257. In support of the second allegation, PSP argues that it cannot make the necessary investments to continue competing if it no longer has access to the 2 million Alabama

15

residents who are Prime beneficiaries, including the roughly 1 million Alabama residents who have commercial insurance. (ECF No. 91, p. 22).

PSP's allegations are conclusory and insufficient to state a plausible cause of action as required to survive a Rule 12(b)(6) motion. In its complaint, PSP alleges that there are 900,972 people in Alabama who have Blue Cross commercial insurance. Sec. Amend. Compl. ¶ 242. In its brief, PSP further notes, based on this Court's previous Report and Recommendation, that there are 4,887,871 people in Alabama. (ECF No. 91, p. 9 n. 3). That means PSP must plead facts that show it is plausible that it could not continue operating in Alabama despite the fact that it is able to provide pharmacy services to more than 80 percent of the market. It very well may be true that commercially-insured patients make up such a disproportionate share of a specialty pharmacy's revenue. Indeed, it would have been relatively simple for PSP to plead facts in support of this allegation. PSP could have pled facts showing what portion of its revenue it derived from people with commercial-insurance customers, how the prices PSP charged to those customers compared to non-commercially-insured customers, and what PSP's profit/loss margin would be if it lost access to commercially-insured customers. PSP could also have identified the number of commercially-insured customers that it served as compared to those with other types of insurance. These facts are already in PSP's possession and would not require discovery to develop them further. This information would have provided the type of "factual enhancement" necessary to move PSP's complaint from containing naked assertions to well-pleaded allegations *See Iqbal*, 556 U.S. at 678. It would have further permitted the Court to evaluate the true impact of commercially-insured customers on

PSP's bottom line and, in turn, analyze whether this was the rare case where special circumstances justified a relatively unique product market. PSP, unfortunately, does not plead sufficient facts that allow the Court to conduct that analysis.

The Court also does not find persuasive PSP's argument that it cannot operate without Prime's "2 million Alabama beneficiaries and roughly 1 million commercially-insured Alabama beneficiaries." PSP's argument merely suggests that PSP cannot operate without access to Prime's beneficiaries, *commercially-insured or otherwise*. Given this inconsistency, the Court cannot rely on this argument to find it plausible to infer that sales to commercially-insured patients are critical to PSP's survival. The Court recommends that PSP's unreasonable restraint of trade claim be dismissed as a result.

## 2. Section 2 of the Sherman Act and Section 3 of the Clayton Act

PSP's failure to plead a plausible product market is also dispositive to its conspiracy to monopolize, attempted monopolization, and Section 3 Clayton Act claims. As the Court previously noted, each of these claims require the plaintiff to plead a viable product market. *See PSP*, 2019 WL 1239705, at *7-*10; *see also Little Rock*, 591 F.3d at 593-94, 596-98 (applying same product market analysis to Section 1 and Section 2 claims under Sherman Act). The Court therefore recommends that each of these claims also be dismissed for failure to plead an adequate product market.

PSP's failure to plead a viable product market does not, however, necessarily resolve its monopolization claim. To plead a plausible monopolization claim, the plaintiff must allege facts that demonstrate (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power through anticompetitive

means, rather than as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966); *Double D Spotting Serv.,* 136 F.3d at 560. There are two ways a plaintiff can establish monopoly power. First, a plaintiff can define a relevant product and geographic market in the same way a plaintiff pleading a rule-of-reason claim would do and then plead facts showing the defendant has a high market share of the relevant market. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999). This option is not available to PSP because it failed to allege facts defining a plausible product market.

A plaintiff can also plead monopoly power by alleging facts that show direct evidence of that power. *Id*. A plaintiff pleads direct evidence of monopoly power by alleging facts that show the defendant exercised actual control over prices or actually excluded competitors. *Id*. Though PSP has pled facts that show Prime actually excluded PSP from the market, PSP has not pled facts to show that Prime maintained that power through anticompetitive conduct.

The Court's reasoning on this point is largely identical to its reasoning in its previous Report and Recommendation. There, the Court explained that "Section 2 of the Sherman Act does not restrict the right 'of [a] trader or manufacturer engaged in an entirely private business . . . to exercise his own independent discretion as to parties with whom he will deal.'" *PSP*, 2019 WL 1239705, at *8 (quoting *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 518 (8th Cir. 2018)). The Court further noted the existence of a limited exception to this rule, provided that the plaintiff was able to plead facts showing that the defendant terminated a long-standing, previously profitable

relationship with the intent of harming competition. *Id*. (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 593-94 (1985)). The Court also noted that a plaintiff could demonstrate an intent to harm competition by pleading facts that showed the defendant displayed "a willingness to forsake short-term profits[.]" *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). For two reasons, PSP's allegations are insufficient to meet this exception.

First, as with its previous complaint, PSP does not plead any facts that show Prime suffered short-term harm from its termination of PSP. PSP does not allege Prime paid more to other pharmacies to account for the termination of PSP. Nor does PSP allege that Prime lost customers because it terminated PSP from its network. PSP also does not contend that Prime failed to provide services to its members after it terminated PSP from its network. PSP's monopolization claim fails for this reason alone.

Second, under current circuit precedent, the limited exception set forth in *Aspen* requires the plaintiff to plead facts showing that the terminated relationship was between two entities operating at the same market level. The Eighth Circuit's decision in *Park Irmat* is instructive on this point. In that case the plaintiff was an independent mail-order pharmacy that filed suit against the PBM Express Scripts after it terminated the plaintiff from its network. *Park Irmat*, 911 F.3d at 511-12. The plaintiff alleged that Express Scripts violated Section 2 of the Sherman Act by using its power as a PBM to exclude mail-order pharmacies that competed with mail-order pharmacies that Express Scripts owned. *Id*. at 517. The district court dismissed the claim under Rule 12(b)(6). *Id*. at 511.

In affirming the district court, the Eighth Circuit recognized that a plaintiff could plead a plausible monopolization claim by alleging facts that showed the defendant suddenly terminated an agreement following "years" of cooperation between the parties. *Id*. at 518. Though the Eighth Circuit recognized that the plaintiff participated in Express Scripts' PBM network for several years, the Eighth Circuit still concluded that plaintiff's claim failed because it did not allege a "voluntary, years-long relationship regarding their *competing mail-order pharmacies*." *Id*. (emphasis added). The Eighth Circuit's reasoning was consistent with the Supreme Court's decision in *Aspen*. There, the refusal to deal claim arose between competing ski resorts, who agreed for several years to a joint lift ticket for their respective ski areas. *Aspen*, 472 U.S. at 593-94. Based on these two cases, the Court must conclude that the *Aspen* exception applies only when the plaintiff alleges facts showing the defendant terminated a long-standing relationship between two businesses that operated at the same market level.

Applying the logic of *Park Irmat* and *Aspen*, to this case, the Court must also recommend dismissal of PSP's monopolization claim on this ground as well. PSP may have had a years-long relationship with Prime as a PBM. But PSP does not allege any facts to show that it had any relationship, let alone a long-standing one, with Prime's pharmacies. As a result, PSP fails to allege facts that meet the *Aspen* exception.

### 3. Section 7 of the Clayton Act

Finally, PSP claims the joint venture between Walgreens and Prime is unlawful under Section 7 of the Clayton Act. Section 7 prohibits mergers and acquisitions that either substantially lessen competition or tend to create a monopoly. 15 U.S.C. § 18. "Section 7

claims are typically assessed under a 'burden-shifting framework.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Chi. Bridge & Iron Co. v. FTC,* 534 F.3d 410, 423 (5th Cir. 2008)). To plead a plausible Section 7 claim, the plaintiff must first allege facts that establish a relevant product and geographic market. *Id*. The plaintiff must then demonstrate that merger has resulted, or will result, in "anticompetitive effects in that market." *Id*. at 785. In this case, PSP alleges that the "*horizontal* merger of Prime and Walgreens' pharmacy operations reduced competition and allowed Prime/Walgreens/AllianceRx to monopolize the Relevant Markets." Sec. Amend. Compl. ¶ 498 (emphasis in original).

While Section 7 of the Clayton Act requires a plaintiff to plead a viable product and geographic market, the Court's previous analysis regarding PSP's proposed product market in its other antitrust claims is not dispositive here. Because PSP's other antitrust claims are essentially "restraint-of-trade claim[s] brought by a 'shut-out' supplier," they require that PSP plead a product market that includes all buyers for its services. *FTC v. Sanford Health*, No. 17-cv-133, 2017 WL 10810016, at *25 (D.N.D. Dec. 15, 2017), *aff'd sub nom. Fed. Trade Comm'n v. Sanford Health*, No. 17-3783, 926 F.3d 959 (8th Cir. June 13, 2019); *see also Little Rock*, 591 F.3d at 596. But Section 7 does not necessarily require a plaintiff to plead a product market that includes all interchangeable buyers, even if the person bringing the claim participates in the market as a seller. *Sanford*, 2017 WL 10810016, at *25. That is because Section 7 seeks to remedy the harm caused by anticompetitive mergers, which does not necessarily require the Court to determine whether there are other customers to whom a shut-out supplier can sell.

21

Though PSP's proposed product market is not necessarily fatal to its Section 7 claim, PSP must still establish that it has standing to challenge the joint venture. There are two different provisions of the Clayton Act that might provide PSP standing. The first provision, Section 4 of the Clayton Act, allows any person "injured in his business or property" by a violation of the antitrust laws to obtain money damages. 15 U.S.C. § 15. The second provision, Section 16 of the Clayton Act, permits any person to seek injunctive relief against any threatened loss or damage caused by a violation of the antitrust laws. 15 U.S.C. § 26. There are significant differences between the two provisions. Section 4 is "retrospective" and permits the recovery of damages only if the alleged anticompetitive conduct injured the person directly. *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 412 (1st Cir. 1985). In contrast, Section 16 is "prospective and prophylactic." *Id*. It allows a party to obtain injunctive relief simply by demonstrating the threat of injury from an "impending violation of the antitrust laws." *Id*.  In this case, PSP seeks only monetary damages. Sec. Amend. Compl. ¶ 502. Thus, its claim is subject to the requirements of Section 4.

For a plaintiff to recover under Section 4, he or she must allege facts that show more than just a causal link between the injury and "an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Instead, the plaintiff must demonstrate that the alleged injury is "attributable to an anti-competitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109-10 (1986)). In a Section 7 case, the alleged anticompetitive conduct is the merger of two companies, or

22

the acquisition of one company by another. 15 U.S.C. § 18. As a result, for a plaintiff to plead a claim of damages under Section 7, the plaintiff must establish that the damages are attributable to the challenged acquisition. *See Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994) (holding that the plaintiff has not suffered an antitrust injury if the injury would have occurred "without regard to the allegedly anticompetitive acts" of the defendant). Stated another way, the plaintiff must plead "that the illegal antitrust conduct was a necessary predicate to [its] injury or that [the defendant] could exclude [the plaintiff] only by engaging in the antitrust violation." *Id*. PSP fails to plead facts establishing as much in its Second Amended Complaint.

To establish antitrust injury when challenging a horizontal merger, the plaintiff "must show that it was injured *because* the acquiring and acquired firms are competitors in a field of commerce." *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1242 (3d Cir. 1987) (emphasis added). "It is not enough to demonstrate that, by happenstance, the merging firms are competitors or potential competitors." *Id*. But even assuming that the joint venture between Prime and Walgreens pharmacies violated Section 7 of the Clayton Act (and the Court certainly does not intend to suggest that it did), the Court cannot conclude that PSP's injury resulted from merger of competing pharmacies. According, to PSP, the direct injury that it suffered – exclusion from Prime's network – resulted from Prime deciding *as a PBM* to terminate PSP. Even if Prime's joint venture with Walgreens influenced the decision to terminate PSP, the harm that PSP suffered was not because Prime and Walgreens pharmacies merged, but because Prime as a PBM acquired a competing pharmacy, which caused PSP to lose Prime's beneficiaries as

23

customers. *See Alberta Gas*, 826 F.2d at 1242 (concluding the plaintiff failed to establish antitrust injury because the alleged injuries flowed "not from the elimination of [the defendant] as a potential competitor, but from the loss of [the defendant] as a future *consumer*") (emphasis in original). Accordingly, PSP fails to establish injury that is attributable to the horizonal aspects of the joint venture. The Court recommends that PSP's Section 7 claim be dismissed.

To some degree, this may seem a harsh result to PSP. Had PSP challenged the vertical aspects of the merger, resolution of the antitrust injury question may have been a closer call. Thus, recommending dismissal on the fact that PSP challenged the horizontal, but not the vertical aspects of the merger might seem to be a distinction with little difference. But the process of challenging a merger on vertical grounds is substantially more difficult than challenging a horizontal merger. When challenging a horizontal merger, the plaintiff can use a "short cut" based on the merging parties' market share to establish a presumption of anticompetitive effect. *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). But when litigating a vertical merger, the plaintiff "must make a fact-specific showing the proposed merger is likely to be anticompetitive." *Id.* (citation and internal quotation marks omitted). As a result, whether a plaintiff attempts to challenge a merger or joint venture based on its vertical effects or its horizontal effects has a substantial impact on how the plaintiff must present his or her case. It is fair, as a result, to require PSP to plead injury attributable to the horizontal effects of the merger if it wishes to take advantage of the short cut available to parties who challenge horizontal mergers.

### B.  Leave to Amend the Federal Claims

PSP again asks that the Court grant PSP leave to amend its antitrust claims if the Court recommends those claims be dismissed. Though the Court previously granted leave to amend, it expressly warned PSP that justice provided only "*one more opportunity* for PSP to plead facts establishing a viable antitrust claim." *PSP*, 2019 WL 1239705, at *11. (emphasis added). PSP has failed in that opportunity. This is the third complaint that it has filed in this matter. It received the substantial benefit of repleading even after the Court issued a detailed Report and Recommendation identifying several deficiencies with PSP's antitrust claims. Despite multiple opportunities, PSP has still failed to plead an antitrust claim that survives a Rule 12(b)(6) motion. The Court must recommend at this time that PSP's antitrust claims (Count 16) be dismissed with prejudice.

### C.  State Law Claims

As with its previous complaint, PSP also raises a number of state law claims. It argued in the previous motion to dismiss that even if the Court dismissed the federal antitrust claims, the Court could still exercise diversity jurisdiction over the state law claims. *See* 28 U.S.C. § 1332(a)(1). The Court rejected that argument, concluding that both Prime and PSP were citizens of Florida. *PSP*, 2019 WL 1239705, at *10. PSP does not renew its argument regarding diversity jurisdiction in this motion to dismiss.

Because diversity jurisdiction does not exist, the Court must consider whether to retain supplemental jurisdiction over PSP's state law claims. *See* 28 U.S.C. § 1367(c). In its previous Report and Recommendation, the Court noted that the "'normal practice' is to dismiss supplemental state law claims when the federal claims are dismissed prior to

trial." *PSP*, 2019 WL 1239705, at *11 (quoting *Kapaun v. Dziedzic,* 674 F.2d 737, 739 (8th Cir. 1982)). Given this practice, the Court declined to recommend the continued exercise of supplemental jurisdiction.

The parties have identified no reason why supplemental jurisdiction should now be exercised. In fact, neither party asks the Court to retain supplemental jurisdiction over the state law claims. As with the first amended complaint, PSP's remaining claims turn solely on questions of state law. In addition, with the exception of motion practice related to the filing of the amended complaint, litigation has not proceeded any further than it had when the Court issued its first Report and Recommendation. Accordingly, the Court again recommends that PSP's state law claims be dismissed without prejudice for lack of jurisdiction.

## III.    MOTION IN LIMINE REGARDING SETTLEMENT DEMAND LETTER

The parties again dispute whether it was appropriate for Prime to file a settlement letter that it received from PSP's attorneys as support for certain arguments it made regarding PSP's state law claims. PSP again moves to exclude that letter from the Court's consideration. In its previous Report and Recommendation, the Court declined to consider the issue raised in PSP's motion because the Court no longer had jurisdiction over the claims to which that motion related. *Id*. The same reasoning applies here. The Court again recommends that Plaintiff's Motion in Limine be denied as moot.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 83) be **GRANTED** as follows:

    a. Counts 1 through 15 of the Second Amended Complaint be **DISMISSED WITHOUT PREJUDICE** for lack of supplemental jurisdiction; and

    b. Count 16 be **DISMISSED WITH PREJUDICE.**

2. Plaintiff's Motion in Limine to Exclude Settlement Demand Letter (ECF No. 101), be **DENIED AS MOOT.**


Date: August 8, 2019                 *s/ Tony N. Leung*

                                         Tony N. Leung
                                         United States Magistrate Judge
                                         District of Minnesota

                                         *Physician Specialty Pharmacy, LLC v.*
                                         *Prime Therapeutics, LLC*

                                         No. 18-cv-1044 (MJD/TNL)


## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).